J-E02009-14
J-E02012-14

2014 PA Super 223

| | |
|---|---|
| IN THE INTEREST OF: M.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.T., III AND M.T., PARENTS | |
| | No. 1138 WDA 2013 |

Appeal from the Order entered June 10, 2013,
in the Court of Common Pleas of Blair County,
Civil Division, at No(s): CP-07-DP-0000077-2012

| | |
|---|---|
| IN THE INTEREST OF: C.T., IV., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.T., III AND M.T., PARENTS | |
| | No. 1139 WDA 2013 |

Appeal from the Order entered June 10, 2013,
in the Court of Common Pleas of Blair County,
Civil Division, at No(s): CP-07-DP-0000076-2012

| | |
|---|---|
| IN THE INTEREST OF: M.J.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.T., III AND M.T., PARENTS | |

J-E02009-14
J-E02012-14

Appeal from the Decree entered March 5, 2014,
in the Court of Common Pleas of Blair County,
Orphans' Court, at No(s): 2013 AD 39A

| | |
|---|---|
| IN THE INTEREST OF: C.E.T., IV., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.T., III AND M.T., PARENTS | |
| | No. 542 WDA 2014 |

Appeal from the Decree entered March 5, 2014,
in the Court of Common Pleas of Blair County,
Orphans' Court, at No(s): 2013 AD 39

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, SHOGAN, ALLEN, OTT, WECHT, STABILE, and JENKINS, JJ.

OPINION BY ALLEN, J.:                                   **FILED OCTOBER 08, 2014**

M.T. ("Mother") and C.T., III ("Father") (collectively "Parents") have appealed from the June 10, 2013 Orders changing the permanency placement goal of the parties' two dependent children, C.E.T., IV (d.o.b. September 2010), and M.J.T. (d.o.b. October 2011) ("the Children"), to adoption, and from the March 5, 2014 decrees terminating Mother and Father's parental rights.

We initially note that although the trial court conducted the termination hearing on November 21, 2013, the trial court waited until this

2

Court affirmed the Children's goal change on March 4, 2014 before entering the March 5, 2014 termination decrees. On April 17, 2014, this Court entered an order granting *en banc* reargument, and withdrew the March 4, 2014 decision affirming the goal change. The trial court did not vacate the termination decrees it entered on March 5, 2014. We find no error in such action, and note that "a goal change from reunification to adoption [i]s *not* a necessary prerequisite to the initiation of involuntary termination proceedings." ***In re N.W.***, 859 A.2d 501, 507 (Pa. Super. 2004) (*citing **In re M.G.***, 855 A.2d 68 (Pa. Super. 2004) (emphasis in original)). Our Supreme Court has held that "an agency may file a termination petition even where reunification remains the permanency goal for the child." ***In re Adoption of S.E.G.***, 901 A.2d 1017, 1026 (Pa. 2006). This is due in part to the policy espoused by the federal Adoption and Safe Families Act, 42 U.S.C. § 671-675, which imposes upon the states the requirement to focus on a dependent child's need for permanency, rather than the parents' actions. Consistent with the foregoing, we consider both the June 10, 2013 orders effectuating goal change, and the March 5, 2014 decrees terminating Mother and Father's parental rights.

Critical to our analysis in this appeal is the trial court's compelling, detailed and accurate recitation of the evidence of record. Because of its relevancy, we adopt and reproduce the trial court's recitation of the facts and procedure below:

> Relative to the parents' initial appeal concerning the goal change to adoption, [the Superior] Court entered a decision filed March 4, 2014 affirming [the trial] court's Order of June 10, 2013 by a 2-1 decision. However, after submission of an application for re-argument by the parents, [the Superior] Court

subsequently entered an Order on April 17, 2014 granting their application and vacating its prior March 4, 2014 Order. On June 3, 2014, [the Superior] Court entered an Order denying BCCYF's motion to consolidate the goal change and termination of parental rights appeals, but indicated instead, that the cases will be listed as related appeals. The matter of re-argument pertaining to the goal change, and the termination of parental appeals, is to be submitted on briefs by counsel of record for the parties before an *En Banc* panel on August 5, 2014.

The subject children, C.E.T., IV and M.J.T., were removed from the care of their parents on June 22, 2012 pursuant to a Voluntary Placement Agreement signed by the parents, C.T., III and M.T. C.E.T., IV was placed in the [M.] foster home on such date, while M.J.T. was placed in the same foster home three (3) days later (June 25, 2012) upon her release from the hospital. A Dependency Petition was filed for both children on July 5, 2012, and an Adjudicatory Hearing was scheduled before the master on July 18, 2012. However, both parents and the paternal grandparents, C.T.J. and P.T., requested that the matter be heard by a judge in the first instance, therefore, the matter was subsequently scheduled before the undersigned on **September 13, 2012.**

By Orders of Adjudication entered **September 17, 2012**, both children were declared dependent and have remained in the custody of BCCYF since such time. BCCYF initially became involved with this family after receiving two (2) Childline reports on June 19, 2012. The initial Childline report (C.L. No. 07-11165) alleged that M.J.T. was the victim of abuse (serious physical injury and serious physical neglect) by her paternal grandfather, C.E.T., Jr., due to second degree burns suffered to her feet, ankles, thigh and buttocks. She was admitted to UPMC – Mercy Hospital in Pittsburgh, PA. (RR 3-4; Order of Adjudication, 9/17/12 ¶15 (a)(1)). The second Childline report (C.L. No. 07-11166) alleged that M.J.T. was the victim of abuse (serious physical injury) as a result of severe proximal humerus fracture and metacarpal fracture, as well as various bruising to her face, head and extremities, and abrasions to the left eyelid, nose, upper lip and chin that were inconsistent for a child her age (at the time of the Childline referral the identity of the perpetrator(s) was unknown). (RR 4; Order of Adjudication, 9/17/12, ¶15 (a)(1)).

4

The daughter, M.J.T., was seen by Dr. Janet Squires and Dr. Joy Richmond while at UPMC – Mercy. Both doctors opined that the bruising and fractures could <u>not</u> have been caused by an accidental source. (RR 5). More specifically, Dr. Squires reported that after reviewing an x-ray of M.[J.T.]'s injuries, the right humerus fracture was estimated to be one (1) to three (3) weeks old, and that the metacarpal fracture was most likely caused by squeezing or pounding of the hand. (See Dependency Petitions, p. 5).

In our September 17, 2012 Order of Adjudication, we specifically made the following finding:

"…the court finds clear and convincing evidence that the child, M.J.T., was the victim of abuse (serious physical injury) relating to the bruises, abrasions and fractures. The court further finds clear and convincing evidence that the bruising, abrasions, fractures and burns all would have caused M.J.T. severe pain and would have significantly impaired the child's functioning and development for a period of time. With respect to the identify (sic) of the perpetrator of the bruises, abrasions and fractures, however, there is only prima facie evidence that the perpetrators of the abuse are the parents and grandparents due to the fact that they were the only ones responsible for the welfare of the children during the time that the injuries occurred…"

Order of Adjudication, 9/17/12, ¶15(a)(1)

The 6th Month Permanency Review hearing was held December 11, 2012. In our Permanency Review Order of December 13, 2012, we found that "[t]he parents still must come to a greater understanding and appreciation relative to the burn injuries and fractures that [M.J.T.] suffered, including the cause(s) of such injuries." (Permanency Review Order, 12/13/12, ¶3(b)(ii)). We also found that each child was doing well in the [M.] foster home and that Mr. & Mrs. M[.] were a permanent adoptive resource if reunification did not occur. (Permanency Review Order, 12/13/12, ¶23(b)). Finally, we found that the parents had made "slow progress relative to the FICS Reunification Services." (Permanency Review Order, 12/13/12, ¶23(i)).

Reunification services were initiated through Family Intervention Crisis Services (hereinafter "FICS") on July 26, 2012 and remained open until June 10, 2013. (RR 10, 60, 128, 275 & 283). During the course of time, visits were increased, but always remained fully supervised. FICS also offered separate counseling sessions and parenting education sessions once per week with both parents. (RR 10, 61 & 134). The counseling and parenting sessions were later combined in February of 2013. (*Id.*). In addition, FICS facilitated the Women Aware Program for the mother, the Men Helping Men Program for the father, with the goal of assisting the parents in their relationship with one another. (RR 56 & 135).

In addition to the services provided by FICS, the family was afforded numerous other services to assist them in reaching the goal of reunification. (RR 10-11, 55 & 70). For example, the parents attended the Family Resource Center Parenting Program in September 2012, and were scheduled to continue until November 15, 2012. (RR 10-11). However, both parents were discharged from the program due to the distraction caused by [Father] openly flirting with other women in the group (RR 70). Further, both parents were engaged with the Parents as Teachers Program (RR 55), and both children receive Early Intervention Services (RR 51 & 217). Shelley McCune of FICS noted that there were some positive attributes for the parents, for example, they were cooperative, kept a clean and orderly house, possessed a strong desire to have their children return home, and developed a good relationship with the resource parents. (RR 13-15).

Ms. McCune, however, also noted several deficiencies that the parents shared, including a lack of understanding of the injuries that their daughter had suffered which resulted in her placement. (RR 17). A particular concern was the fact that neither parent recognized the child's obvious body bruising; did not realize that she had suffered several broken bones, and had no knowledge nor any explanation as to how those injuries occurred. (RR 17). The parents' lack of knowledge and their failure to offer a viable explanation as to what occurred to their daughter has been, and continues to be, a very serious concern to this court because of the difficulty this creates in ensuring that the children are safe in the care, custody and control of their parents. (RR 17).

Ms. McCune further noted that the parents were very dependent on the children's paternal grandparents for basic support. For example, the grandparents provided child care, transportation, financial assistance and general assistance in every day matters that the parents could not understand or handle on their own. (RR 19-20). Although we recognize that a positive support system is important in any family situation, of particular concern to this court is that the serious and significant injuries suffered by the daughter occurred while she was solely in the care, custody and control of the paternal grandfather (RR 19-20).

During the supervised visits observed by FICS, there were several ongoing safety concerns. (RR 72, 76-78 & 81). Ms. McCune testified during one occasion, C.E.T. was playing with an open pair of adult scissors and the parents needed prompting to remove them from his possession. (RR 78). There was another occasion when the parents had a space heater on the floor of their residence that became hot enough to burn on contact with the skin. (RR 78). The children would walk over toward the heater, which needed to be addressed several times with the parents. (*Id.*). Ms. McCune expressed concern with the parents' inability to recognize situations that could jeopardize the safety of their children. (*Id.*).

Another area of concern noted at the initial Adjudicatory hearing was the parents' inability to recognize appropriate developmental stages for their children. For example, the father would refer to the daughter as walking when she was actually crawling; they both claimed that the daughter was crawling and pulling herself up at the age 4 months; etc. Due to these concerns, BCCYF requested that both parents undergo psychological evaluations to assess their intellectual functioning and parenting skills. (RR 8, 20-21).

A 9th Month Interim Review Hearing was held **March 5, 2013**. In our March 12, 2013 Permanency Review Order, we stated the following: "FICS has a concern in that despite the investment of services and the passage of time, the visits remain fully supervised as the parents are not always fully attentive to the children which raises safety concerns" and "the parents cannot consistently ensure that the children are safe in their care. FICS also expressed a concern with the father being disrespectful toward the mother, and that he has been verbally

abusive in the past as well, which negatively affects the mother's self-esteem." (Permanency Review Order, 3/12/13, ¶¶3(a)(ii)and3(b)(ii).

In our March 12, 2013 Permanency Review Order, we also indicated that before the children could be reunified with their parents, that "[t]he court needs to be satisfied that they are capable of being fully attentive to the needs of their children and that they can consistently provide a safe and secure environment." (Permanency Review Order, 3/12/13, ¶7).

The psychological evaluations of the parents occurred on January 30 and February 12, 2013, by Marilyn Morford, Ph.D. (RR 98). Dr. Morford is a licensed psychologist with a specialty in child psychology. The purpose of her evaluation was to determine the parents' intellectual, personal, and emotional functioning, as well as their parenting ability and the relationship between the children and parents. (RR 99; Psychological Evaluations, p. 1). Dr. Morford's Psychological Evaluations were admitted as Petitioners' Exhibits 1 & 2 at the March 13, 2013 hearing and are incorporated herein.

Dr. Morford testified that both parents have some limitations with intellectual functioning (RR 101; M.T. Psychological Report, p. 6; C.T. Psychological Report, p. 5). After conducting an assessment of [Mother's] verbal comprehension, she was considered to have an approximate developmental age of an average 14 year old, while [Father's] verbal comprehension placed him approximately at the developmental age of a 9 year old. (RR 103; *Id.*). Dr. Morford explained that at these developmental ages, the parents would have limitations with their abstract reasoning and planning. Such would also significantly affect their functioning in relation to their parenting ability. (RR 103-104). Further, the parents were observed to have difficulty with adaptive skills and daily functions. (RR 126).

Dr. Morford also expressed concern with the mother's lack of understanding of developmental milestones relative to the children. (RR 107). As to the father, Dr. Morford noted that he had a tendency to deny basic flaws and that he had issues with maturity, such as impulse control. (RR 109). Dr. Morford explained that the father's level of intellectual maturity may be

affecting his ability to focus on monitoring the children and responding to them at an appropriate level. Consequently, [Father's] intellectual immaturity was found to be one of the primary factors that affected his ability to properly parent the children. (RR 109-110).

At the 9th Month Interim hearing, Dr. Morford continued to question whether the parents could remedy the circumstances related to the safety issues that necessitated the children's placement in a reasonable amount of time due to their limited intellectual abilities and emotional needs. (RR 114 & 125). Further, Dr. Morford found it significant that the service providers who had been in the home the prior six (6) months offering reunification services determined that they could not scale back from a full level of supervision. (RR 115). Therefore, Dr. Morford did not foresee a time in the near future when daily checks and supervision would not be important to monitor the safety of the children in their parents' home. (RR 115).

At the time of the 9th Month Interim hearing in March 2013, Ms. McCune confirmed that with the lack of progress being made relative to the visits and counseling, she concurred with Dr. Morford in her belief that she did not foresee any time in the near future that visitation could be scaled back from full-time supervision. (RR 147). Even though the parents were generally cooperative with the services, there remained a lack of consistency, the parents were easily distracted, they were not consistently implementing what they had been taught; and safety issues continued to persist. (RR 148-149). Ms. McCune stated that the parents also continued to have unrealistic developmental expectations for their children. (RR 152). Ms. McCune also noted that the parents provided inconsistent statements as to how the injuries to their daughter occurred. (RR 157-158).

At the 9th Month Review hearing, it was expressed to the parents by this court and BCCYF that they needed to show significant improvement and consistency before reunification with the children would occur. (RR 184-185). Unfortunately, over the next three (3) month period, FICS felt the need to continue to provide fully supervised visits as they still had significant concerns concerning the parents not consistently implementing safety suggestions and being able to supervise their children on their own. Furthermore, if the grandparents

were present, the parents would tend to step back and rely upon the help of the grandparents. (RR 206-207). FICS still noted continued safety concerns concerning the children, and the need to intervene to avoid potential safety hazards. (RR 208-210 & 215).

Despite the numerous services provided to the parents, as of June 2013, Ms. McCune still could not recommend that the children be returned to the parents' care. In fact, she was not able to provide a time frame for the parents to achieve a level of unsupervised visits due to their lack of progress to date. (RR 217-218, 220). Ms. McCune also pointed out that there were more concerns in the most recent two (2) months than there had been in the prior months. (RR 231-238). Ms. McCune testified that the parents actually regressed in the area of consistently recognizing and addressing safety concerns. (RR 218, 220).

After the 12th Month Review Hearing held **June 7, 2013**, we entered an Order on June 10, 2013, wherein we made the following findings as to both parents:

> "[T]he mother and father have attended nearly all meetings and visits with FICS Reunification Services, but they have failed to recognize and appropriately address the safety concerns for the children on a consistent basis. The parents continue to work with Parents as Teachers in their home weekly. The child, [C.E.T., IV], continues to receive therapy for his developmental delays through both Denise Adams and the FICS Parent Educator, and the mother will utilize at times the tools and techniques that she has been taught, but not on a consistent basis. The visits that occur remain fully supervised due to safety concerns. [The parents] have not demonstrated any ability to protect their children on a consistent basis, and often have immature responses to FICS' staff when safety concerns are expressed. Despite the efforts and time investment by the service providers, there does not appear to be any hope of significant improvement. As a result, we cannot find that the children would be protected and safe in their parents' care."

(Permanency Review Order 6/10/13, ¶3(a)(ii) and ¶3(b)(ii))

We also made the following specific factual findings:

\*\*\*

(c)     The foster parents are an adoptive resource, and both BCCYF and FICS support Mr. and Mrs. M[.] in their desire to adopt the children.

(d)     Despite the number of services that have been in place for the past one (1) year, the parents have not made significant progress and have not shown any insight or demonstrated any consistency that they can safely protect their children if they were in their custody.   This is especially concerning considering the children are only two (2) and one (1) year of age.

(e)     There has never been any plausible explanation or further information provided as to [M.J.T.]'s 2nd degree burn injuries to her feet/ankles, thigh and buttocks (CL No. 07-11165) nor her fractures and bruising (CL No. 07-11166) which occurred during times when only the parents and paternal grandparents were the caregivers.   As a result, the parents have not demonstrated any ability to remedy the circumstances that originally led to placement.

(f)     There exists a parent-child relationship between the children and their biological parents, but the children have also developed a parent-child relationship with Mr. and Mrs. M[.], where they have been placed since 6/22/12.  The children look to the M[.]s to meet their needs, and are provided safety, structure and appropriate care within their home.

As a result, under the Order section, we changed the goal to adoption and directed that reasonable efforts were no longer required for either parent, and that compelling reasons no longer existed not to pursue TPR.  (Permanency Review Order, 6/10/13, ¶23(b) – (c)).

At the **November 21, 2013** combined 18th Month Permanency Review and TPR proceeding (filed to Blair County No. 2013 AD 39 & 39A), the BCCYF caseworker Nicole Heidler testified.   Ms. Heidler confirmed that the children were comfortable in the M[.] foster home and that both children refer to the M[.]s as "mom" and "dad" and that they sought the M[.]s

out to meet their needs. (RR 242-243, 291-292). Ms. Heidler also testified that the children were not only bonded to their foster parents, but also to each other. (RR 292-293). In the M[.]'s care, C.E.T., IV was making progress with his speech development through Headstart, and M.J.T. was also progressing and had no developmental issues since her placement. (RR 293).

Even though the supervised visits at the BCCYF office with the parents generally went well, Ms. Heidler testified that the foster parents appeared to be more of the parental figures to these children based upon her own observations of their interactions together. (RR 307). There are no separation issues noted for the children at the end of visits with their parents. (RR 299-300). [The pre-adoptive foster parents] also expressed a willingness to discuss [Parents' continued contact with Children] if a TPR Petition was granted. (RR 300).

Ms. Heidler testified that BCCYF believed it would be in the children's best interests to terminate the parental rights of [Parents], as the children had been with their adoptive resource for nearly 1½ years, more than half of their respective young lives. (RR 302-303). The children's needs have been met by Mr. & Mrs. M[.], and the children have grown and thrived within their home. Therefore, BCCYF desired the termination of parental rights so that the children could achieve permanency. (*Id.*).

Therefore, in our Permanency Review Order of November 27, 2013, the goal remained adoption, reasonable efforts continued not to be required for either parent and compelling reasons did not exist. (Permanency Review Order 11/27/13, ¶23/Order). We also entered under separate cover an Order deferring any decision relative to the TPR Petition until the Pennsylvania Superior Court entered its decision relative to the parents' appeal of our Permanency Review Order of June 10, 2013, wherein we changed the goal to adoption.

Trial Court Opinion, 7/22/14, at 2–8 (bolded dates in original).

On appeal, Mother and Father collectively raise three issues pertaining to the Children's goal change:

12

    I.     Whether the trial court erred and abused its discretion by determining the best interests of the child would be served by changing the Placement Goal to Adoption where: there is insufficient evidence that such a Goal Change would be in the best interest of the child; there is insufficient evidence of conduct by the parents that places the health, safety or welfare of the child at risk; and the trial court fails to account for the parent-child relationship shared between the parents and their biological children.

    II.    Whether the trial court erred and abused its discretion in changing the goal for the child from reunification to adoption when the parents had exhibited compliance with the permanency plan having attended nearly all visits and participated in or completed nearly all recommended services and the trial court failed to fully consider the bond between the parents and child.

    III.    Whether the trial court erred and abused its discretion where an improper amount of weight was applied to the parents' inability to explain the origin of injuries suffered by M.T., although the parents agree that some injury did occur without their knowledge.

Parents' Brief at 5.

We address Parents' issues together because they are interrelated, and implicate the sufficiency and weight of the evidence assessed by the trial court to the testimony at the twelve-month permanency review hearing.

Our Supreme Court set forth our standard of review for dependency cases as follows:

    [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

13

In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. *In re A.K.*, 936 A.2d 528, 532-533 (Pa. Super. 2007). The burden is on the Agency to prove the change in goal would be in the child's best interests. *In the Interest of M.B.*, 674 A.2d 702, 704 (Pa. Super. 1996). In contrast, in a termination of parental rights proceedings, the focus is on the conduct of the parents under 23 Pa.C.S.A. § 2511. *In re M.B.*, 674 A.2d at 705.

Section 6302 of the Juvenile Act defines a "dependent child" as a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. **A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk,** including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1) (emphasis added).

In *In re G., T.*, 845 A.2d 870 (Pa. Super. 2004), this Court clarified the definition of "dependent child" further.

> The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

*Id.* at 872 (internal quotations and citations omitted); *see also In re J.C.,* 5 A.3d 284, 289 (Pa. Super. 2010). Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *G.,T.*, 845 A.2d at 872.

With regard to a dependent child, in *In re D.A.*, 801 A.2d 614 (Pa. Super. 2002) (*en banc*), this Court explained:

> [A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351 (a).

*Id.* at 617.

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Section 6351(e) of the Juvenile Act provides in pertinent part:

    (e) Permanency hearings.-

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. …

42 Pa.C.S.A. § 6351(e).

Section 6351(f) of the Juvenile Act prescribes the pertinent inquiry for the reviewing court:

**(f) Matters to be determined at permanency hearing.-**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\*\*\*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join an petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

**(f.1) Additional determination.** – Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not

best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and wiling relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

**(f.2) Evidence.** – Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.-** On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

\*\*\*

42 Pa.C.S.A. §6351.

Finally, the court should consider the bond between the child and his parents, foster parents, and siblings. ***In re H.V.***, 37 A.3d 588, 594-595 (Pa. Super. 2012).

18

This Court has stated:

> [T]he focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency, and well-being of the child. The best interests of the child take precedence over all other considerations, including the conduct and the rights of the parent. . . . [W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors.

*In re A.K.*, 936 A.2d 528, 534 (Pa. Super. 2007). In *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006), another goal change case, the trial court granted a goal change to adoption despite the fact that the mother had made substantial progress toward completing her permanency plan. This Court held that the mother's parenting skills and judgment regarding her children's emotional well-being remained problematic.

Here, CYF presented ample testimony from which the trial court could properly change the Children's goal from return to parents with a concurrent goal of adoption to a sole goal of adoption. Ms. Shelley McCune, a counselor with Family Intervention Crisis Services who worked with Parents, could not recommend that Children could be safely returned home to Parents, and she could not provide a time-frame for reunification. N.T., 6/7/13, at 27-28. She testified that Paternal Grandparents are not a good option for placement because of M.J.T.'s burns, and she was also concerned that Paternal Grandparents would allow Parents to be with the Children unsupervised, and there was too great a risk to the Children's safety. *Id*. at 3, 17, 30-31. Ms. McCune acknowledged that Children have a relationship with Parents, but view them as "fun mom and dad" because there is continuous entertainment

19

during the visits. *Id*. at 28, 34. Ms. McCune also observed that Children have a parent/child relationship with their foster parents, and noted that the foster parents are more structured, and allow Children to play on their own and be creative. *Id*. at 29. Ms. McCune averred that stability was in the best interests of the Children. *Id*. at 29-30, 45. She testified that Parents were not demonstrating any insight into how to safely parent; Ms. McCune explained:

> It's not just one situation. It's the overall picture. It's the continued things that we're seeing and the continuing having to redirect and prompt and review. Some of the things that we see were things that were addressed last summer. We need to see at this point that [Parents] are able to transition these things over without somebody constantly saying, hey, that's a risk to these children, that's a danger, that's a safety issue.

*Id*. at 26. Ms. McCune stated that she felt "like we've gone backwards as opposed to going forward." *Id*. at 30. She averred that the longer the current situation continued, the more difficult it would be on the Children to change the goal to adoption at a later point in time. *Id*. at 45.

CYF Caseworker Nikki Heidler testified that Children had been placed with their foster parents since their removal from Parents' care on June 22, 2012, and that the foster parents were an adoptive resource. *Id*. at 52. Ms. Heidler stated that Children are well-adjusted in the foster home, that they play with their own toys and occupy themselves for an age-appropriate amount of time, and that they are very focused. *Id*. Ms. Heidler noticed an improvement in both of the Children's speech. *Id*. She recommended a change of goal to adoption, with Children remaining dependent and in CYF's legal and physical custody until adoption. *Id*. at 60. Ms. Heidler averred

that there would be a major risk to Children's safety if Parents were caring for them with the assistance of Paternal Grandparents, as the four had been the caregivers for Children, and were unaware of M.T.'s burns, fractures and injuries prior to a physician diagnosing them. *Id*. at 67-68. Ms. Heidler testified that Children were attached to their foster parents, and doing well in their home. *Id*. at 59. Ms. Heidler testified that the foster parents would be willing and able to provide an ongoing relationship between Children and Parents. *Id*.

> At the close of testimony, the trial court commented:

> What I gather from Miss McCune's testimony and the position of the Agency is [--] I'm more concerned with a pattern being established here. For example, that particular bath toy might not have parts that can come apart or cause any kind of choking hazard, but what about other toys that do? As I understood Miss McCune's testimony, the concern is having the [C]hildren do these things, engage in these habits and this routine that maybe present [sic] in this particular instance is not dangerous, does not present a hazard[,] but maybe down the road it would depending on a particular toy, depending on playing with a lawn mower that does have a blade, does have gas and so forth.

N.T., 6/7/13, at 72-73. Finding that the CYF witnesses were credible in their testimony that Parents are not capable of safely parenting Children, even with the assistance of Paternal Grandparents, the trial court determined that the Children could not be safely returned to Parents, and that their best interests required a change in the placement goal to adoption.

Father and Mother essentially seek for this Court to re-weigh the evidence and the credibility determinations of the trial court in order to find that the trial court committed an abuse of its discretion. Our Supreme Court

21

has explicitly directed that we may not do so. In ***In re R.J.T.***, the Supreme

Court persuasively stated:

> [W]e are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

***In re R.J.T.***, 9 A.3d at 1190. The Supreme Court noted that, as in the

instant case, the trial court had not itemized its findings with the provisions

of section 6351(f), but had considered those factors. *Id*. The Supreme

Court found the trial court's reasons for its conclusion regarding the goal for

the child in that matter to be supported by the record.

Thus, in ***In re R.J.T.***, our Supreme Court has instructed that we

cannot find an abuse of the trial court's discretion where the record supports

the trial court's decision that a goal change to adoption is "best suited to the

safety, protection and physical, mental and moral welfare of the child." *Id*.

at 1190 (*citing* 42 Pa.C.S.A. § 6351(g)). Here, the record supports the

change of goal to adoption. We will not disturb the trial court's credibility

determinations and weighing of the evidence.

With regard to the termination of parental rights, Mother and Father

collectively raise four issues:

    I.    Whether the trial court erred and abused its discretion by determining that the best interests of the child would be served by terminating parental rights where: there is insufficient evidence that termination would be in the best interest of the child and there is insufficient evidence of conduct by the parents that places the health, safety or welfare of the child at risk.

    II.    Whether the trial court erred and abused its discretion in terminating parental rights where there is not clear and convincing evidence to indicate that: any repeated and continued incapacity, abuse, neglect and/or refusal of the parents has caused the child to be without essential parental care, control or subsistence necessary for the child's physical and mental well-being; those alleged conditions cannot or will not be remedied by the parents; and that the alleged conditions continue to persist.

    III.    Whether the trial court erred and abused its discretion in terminating parental rights of the above-named minor child, C.T., where no abuse or neglect was clearly alleged relative to the child.

    IV.    Whether the trial court erred and abused its discretion in terminating parental rights of the above-named minor child, M.T., where parents could not identify injuries that may have occurred while the child was not under their care.

Parents' Brief at 6-7.

As with their goal change issues, Parents' termination issues are interrelated and implicate the trial court's assessment of the sufficiency and weight of the evidence. We therefore address the issues together.

We review appeals from the involuntary termination of parental rights according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, [___ Pa. ___, ___, 36 A.3d 567, 572 (2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [___ Pa. ___], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 608 Pa. 9, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

Termination of parental rights is governed by section 2511 of the

Adoption Act, which requires a bifurcated analysis:

24

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Here, the trial court terminated Mother and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (8), and (b). Decrees, 3/5/14. With regard to section (a):

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions

25

and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2) and (8).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the Children were removed from Mother and Father's care on June 22, 2012, when Mother and Father signed a Voluntary Placement Agreement. The Children have remained in their foster/pre-adoptive placement. Although the trial court did not enter the termination decrees until March 5, 2014, after this Court filed its March 4, 2014 memorandum affirming the goal change to adoption, the trial court based termination on the evidence presented at the November 21, 2013 hearing. At the time of the November 21, 2013 hearing, the Children had been removed from the care of the parents, approximately **17 months** had elapsed from the date of the Children's removal, and the conditions which led to the removal of the

Children continued to exist, such that termination of parental rights best served the needs and welfare of the Children. *See* 23 Pa.C.S.A. § 2511(a)(2) and (8).

The trial court explained:

> We found that [the Agency] met its burden of providing clear and convincing evidence that grounds for terminating the parental rights of [Mother and Father] existed under both 23 Pa. C.S.A. § 2511(a)(2) and (8). …
>
> This case originated because of two (2) separate findings of abuse relative to [M.J.T.] that occurred when she was in the exclusive care of the paternal grandparents and/or her parents. Neither the parents nor the paternal grandparents ever offered any plausible explanation as to the serious injuries, nor did they ever seem to appreciate the severe nature of such injuries. The child abuse investigation concluded with a finding that abuse occurred relative to the bruising and broken bones by clear and convincing evidence as a result of a serious injury, as well as a finding of *prima facie* evidence that the parents and paternal grandparents were perpetrators of that abuse due to the fact that they were the only individuals responsible for the welfare of the child during the time of the injuries. (RR 4-5; 9/17/12, M.T. Order of Adjudication, p. 4). This finding was never contested nor appealed by the parents or paternal grandparents.
>
> [The Agency] provided numerous services to the parents, including parent counseling and parent education through FICS; the Family Resource Center Parenting Program, the Parents as Teachers Program, and Early Intervention. In addition, [F]ather completed the Men Helping Men Program and [M]other completed the Women Aware Program and participated in counseling services with two different counselors. Despite all such effort by the various service providers, there remained a consistent and serious concern among those same service providers relative to the parents' ability to both identify and adequately address safety issues. The concern over the parents' inability to recognize and appreciate safety issues resulted in FICS providing <u>fully</u> <u>supervised</u> visits, never being able to

transition to even a level of being "loosely supervised", much less unsupervised visits.

We are fully satisfied that [the Agency] provided a reasonable and good faith effort to reunify these children with their parents. As determined by Dr. Morford, these parents have an approximate intellectual capacity of a 9 year old ([Father]) and a 14 year old ([Mother]) respectively. This borderline mental capacity prevents them from making progress toward providing a safe environment for their children. This court believes it to be appropriate to place the children's needs for safety and permanency ahead of a parent's fundamental right to parent a child if they lack the capacity to do so in a safe, effective and consistent manner.

… These children have been removed from the care of their parents, initially by a voluntary agreement with the Agency. Well more than twelve (12) months or more has elapsed from the date of such removal and placement and the conditions which led to the removal or placement of the children continue to exist. In fact, at the time of the TPR proceeding, the children had been in placement for seventeen (17) months. As stated above, we are fully satisfied that a termination of parental rights is in the best interest of each child.

Trial Court Opinion, 7/22/14, at 12-13.

The record supports the trial court's reasoning. CYF Caseworker Nikki Heidler testified to being the Parents' caseworker since July of 2012. N.T., 11/21/13, at 3. She confirmed that the Children had been in placement for seventeen (17) months, and had been in the same foster/pre-adoptive placement since June of 2012. *Id*. Ms. Heidler testified that Parents visited the Children "one time a month" for "an hour and a half fully supervised at Children and Youth." *Id*. at 11. She explained, "In addition to receiving the FICS services, [Parents] were receiving Parents as Teachers which they had sought out on their own when the children came into placement. They were

28

also receiving Early Intervention for [Father] that was helping with parenting skills and helping them to help him develop." *Id*. at 22. Nonetheless, Ms. Heidler advocated for termination, and explained in detail and unequivocally:

> The children have been in placement for over twelve months. They have actually been in the same foster home for seventeen months now. … There still remain unremedied issues of incapacity, abuse, neglect by the parents. The injuries that [M.J.T.] suffered were found to be abuse by prima facie evidence. Those are still unexplained. However, the parents have consistently reported to the Agency and to service providers that they or the grandparents were the only people that could have been caregivers for the children at that time. The parents have not provided any information or documentation that they have been addressing their intellectual or functioning limitations. Those were observed and testified to by [Ms. McCune from Family Intervention Crisis Services]. They were also reported by [Dr.] Marilyn Morford. [Dr.] Morford also noted that in her report that Mom is functioning at the level of a fourteen year old and Dad is functioning at the level of a nine year old. Both parents have difficulty understanding the safety and developmental needs of the children. ***They have never alleviated the safety concerns in the past or to proceed past supervised visitation. When they were visiting with FICS, they have never made the step to the point where they could be unsupervised because of safety concerns in those visits. In fact, in the last month that FICS was providing services, [Parents] had regressed and there were numerous issues that had to be addressed by FICS during the visitations.***

> \*\*\*

> There has been no remedy to the circumstances that led to the placement regarding the injuries to [M.J.T.] or to the lack of supervision of the children.

N.T., 11/21/13, at 13-14 (emphasis supplied).

Given the foregoing, we find the statutory grounds for termination under 23 Pa.C.S.A. § 2511(a)(2) and (8) are supported by clear and convincing evidence of record. *In re R.N.J.*, *supra*.

With regard to 23 Pa.C.S.A. § 2511(b), the statute provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511 (b).

The focus in terminating parental rights under section 2511(a) is on the parent, but the focus turns to the children under section 2511(b). *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). Under section 2511(b), we examine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287 (citation omitted).

With regard to the needs and welfare analysis, the trial court in this case observed:

> It is also our belief that the record established by clear and convincing evidence, after taking into consideration the developmental, physical and emotional needs and welfare of the subject children, that the termination of the parental rights of [Mother] and [Father] would best serve the needs and welfare of the children. It is interesting to note that the parents continue to argue that they need more time and additional services to effectuate reunification with their children. Despite the various services put into effect, the parents have demonstrated an inability to consistently provide a safe and secure environment for their children. The children are thriving in their foster home setting; they refer to their foster parents as "mom" and "dad"; the foster parents have met all of their needs; and these children, especially considering their young age, are entitled to permanency and a safe and stable living environment. The record also supports that the children have formed a loving and secure bond with their [foster parents, who are also] their adoptive resource.

Trial Court Opinion, 7/22/14, at 13.

Again, the record supports the determination of the trial court. For example, the CYF caseworker, Ms. Heidler, testified that the Children are "developing very well" and are "very bonded" with their pre-adoptive foster parents, as well as one another. N.T., 11/21/13, at 4. She explained that the pre-adoptive foster parents have been meeting the children's needs and the children "are thriving and growing and developing in the adoptive home." *Id*. at 14-15. With regard to the parental bond, Ms. Heidler expressed:

> The relationship between the parents, with the children, … During those visits it appears to be more of a play date. They do seek out the parents … to meet their needs during that visitation when they need to go to the bathroom or if they need more food

or something. However, those visits are frequently a lot of play time, which it's a play room. They're little children. It's understandable for the circumstances. Whereas, in my observations with [the pre-adoptive foster parents], are that they're more of a parental figure to the children than the parents are.

*Id*. at 18-19.

The above evidence supports the trial court's consideration of the developmental, physical, and emotional needs and welfare of the Children in determining that the Parents' rights should be terminated pursuant to section 2511(b). ***In re C.M.S. supra***.

For the foregoing reasons, we affirm the trial court with respect to both the dependent Children's permanency placement goal change to adoption, and the termination of Mother and Father's parental rights.

Orders affirmed. Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/8/2014