J-S28032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A., A MINOR CHILD | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.H. | : : : : : : : : | |
| | : | No. 372 WDA 2023 |

Appeal from the Order Entered March 7, 2023
In the Court of Common Pleas of Clarion County Civil Division at No(s):
CP-16-DP-12-2022

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED:  September 21, 2023**

Appellant, C.H. ("Guardian"), the legal guardian of the female child, A.A. ("Child"), born in April 2008, appeals from the order entered March 7, 2023, changing Child's permanency goal from reunification to adoption.[1]  In addition, Guardian's appointed counsel, Sarah N. Grape, Esquire, has filed a petition to withdraw and accompanying brief, pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d

_____

[*] Former Justice specially assigned to the Superior Court.

[1] As an order granting or denying a goal change in a dependency proceeding is appealable, this matter is properly before this Court.  **See In re H.S.W.C.-B.**, 836 A.2d 908, 911 (Pa. 2003).  Additionally, Guardian has standing to participate in the dependency proceeding as standing exists to three classes of individuals: "(1) the parents of the juvenile whose dependency status is at issue; (2) the legal custodian of the juvenile whose dependency status is at issue, or (3) the person whose care and control of the juvenile is in question."  **In re J.S.**, 980 A.2d 117, 122 (Pa. Super. 2009).

349 (2009). After careful review, we grant Attorney Grape's petition to withdraw and affirm the order changing Child's permanency goal to adoption.

The trial court set forth the factual and procedural history as follows.

[Child] is the biological daughter of [M.B. ("Mother")] and [M.A. ("Father")]. [Guardian] is [Child's] great-aunt and legal guardian. [Guardian's] daughter, [L.P.] is [Child's] cousin. In 2010, at the age of two [], [Child] lived with [Guardian] pursuant to a Jefferson County custody order. [Child] remained in [Guardian's] care and custody until she suffered a stroke in December 2021. As a result of her stroke, [Guardian] placed [Child] in the care of [L.P.]. Also living with L.P. was her paramour, [Guardian's] paramour, [R.G.,] and L.P.'s three [] children.

In support of the shelter care application [filed on March 24, 2022], Clarion [County Children & Youth Services ("CYS")] recounted several referrals and reports regarding [L.P.'s] home conditions. The home had an ongoing infestation of bugs, including cockroaches, in addition to feces and rotten food. In addition to the unclean conditions of the home, [L.P.] and her paramour are reportedly alcoholics. Further, [CYS] documented unsecure weapons in the home, including knives and swords. It was also reported that there are unsecured guns in the home and that at times the children had access to and waved them around. Significantly, [CYS] received a referral indicating that [Child] received inappropriate sexual text messages from the men in the home.

On March 24, 2022, [Child] was removed from [L.P.'s] home due to the above-mentioned deplorable living conditions and safety concerns and was placed in the temporary custody of [CYS]. . . . [Child] was placed in a foster home on March 31, 2022, and later removed and placed in Keystone Adolescent Center [("Keystone")] on August 15, 2022.[2]

---

[2] Child was removed from the foster home at the request of the foster parents due to Child's defiant behavior. Notes of Testimony ("N.T."), 2/17/2023, at 26-27. At that time, CYS was unable to find another viable foster home and believed Keystone could help with her mental health diagnoses, namely,

*(Footnote Continued Next Page)*

> Upon discharge from the nursing home, [Guardian] moved in with L.P. in April 2022.

Trial Court Opinion, ("T.C.O."), 4/20/2023, at 2-3 (unpaginated).

On March 29, 2022, CYS filed a dependency petition with respect to Child, which was granted on April 7, 2022. CYS provided Guardian with the following objectives in furtherance of the initial goal of reunification: (1) maintain a safe and clean home environment; (2) eliminate sexual abuse and address trauma associated with related incidents; (3) improve parenting skills; (4) obtain a psychological evaluation; (5) attend visitation; and (6) comply with CYS and other service providers' directives. N.T. at 8, 11, 14.

On February 7, 2023, CYS requested that the court change Child's permanency goal from reunification to adoption. On February 17, 2023, the court held a hearing regarding CYS's request. Child, who was fourteen years old at the time of the hearing, was represented by both a guardian *ad litem* ("GAL") and legal counsel.[3] ***See In re Adoption of L.B.M.***, 161 A.3d 171, 175 n.4 (Pa. 2017) (suggesting that the dependency GAL should request appointment of legal counsel when the child's best interests and legal interests

---

ADHD, PTSD, intermittent explosive disorder, an intellectual disability, and adjustment disorder with emotional and conduct disturbance. ***Id.*** at 16.

[3] The GAL and legal counsel did not file briefs in this matter. At the close of the hearing on February 17, 2023, the GAL concurred with CYS's recommendation to change Child's permanency goal to adoption while legal counsel stated that Child consistently told him that she wants to be reunified with Guardian. N.T. at 38-39.

diverge); *see also* Pa.R.J.C.P. 1154 cmt. Guardian was represented by Attorney Grape and was present for the hearing. CYS presented the testimony of Amanda Gregory, CYS caseworker, and Paul Matusz, Program Manager at Keystone.

By order dated February 17, 2023, and entered March 7, 2023, the court changed Child's permanency goal to adoption. On April 5, 2023, Guardian timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a Rule 1925(a) opinion on April 20, 2023. In this Court, Attorney Grape filed her petition to withdraw and *Anders* brief on May 31, 2023.

Before addressing the arguable merits of Guardian's appeal, we must assess the propriety of Attorney Grape's petition to withdraw and *Anders* brief. *See In re J.D.H.*, 171 A.3d 903, 905 (Pa. Super. 2017). We note that this Court has extended the *Anders* procedures to appeals taken from orders changing permanency goals in dependency proceedings. *See id.* at 906. Accordingly, we will begin our review by considering Attorney Grape's petition to withdraw and the accompanying brief. *See id.* at 905.

In order to withdraw pursuant to *Anders*, counsel must: (1) petition the court for leave to withdraw and aver that, after making a conscientious examination of the record, he has determined that an appeal would be frivolous; (2) furnish a copy of the *Anders* brief to the appellant; and (3) advise the appellant that they have the right to retain private counsel or bring

additional arguments to the court's attention. *See id.* at 907. By way of confirming that client notification has taken place, our precedent requires that counsel provide this Court with a copy of the letter advising the appellant of his or her rights in conformity with *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005). *See J.D.H.*, *supra* at 907.

Our Supreme Court has also set forth substantive requirements for counsel's *Anders* brief, which must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes would arguably support the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. *See id.* (citing *Santiago*, 602 Pa. at 178-179, 978 A.2d at 361). Thus, a compliant *Anders* brief should "articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous." *Id*.

Instantly, Attorney Grape filed a petition to withdraw and an *Anders* brief averring that Guardian's appeal is frivolous. With respect to the petition, Attorney Grape averred that she seeks to withdraw after her review of the record and applicable law. Attached to her petition is a *Millisock* letter dated May 26, 2023, indicating that Attorney Grape provided a copy of the brief to Guardian. *See* Application to Withdraw, 5/26/2023, Exhibit A. This letter properly advised Guardian of her right to retain new counsel, proceed *pro se*, or raise any other issues she deems worthy of this Court's attention. Further,

our review confirms that counsel's *Anders* brief provides a summary of the procedural history and facts of the case with citations to the record, issues that could arguably support Guardian's appeal, and Attorney Grape's assessment regarding why the appeal is frivolous with citations to relevant legal authority. Accordingly, we conclude that Attorney Grape has complied with the technical requirements of *Anders* and *Santiago*.

We next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." *Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*). Attorney Grape's *Anders* brief raises the following issue:

> 1. Whether the trial court committed an error of law and/or abused its discretion in changing [Child's] permanency goal from reunification to adoption?

*Anders* Brief at 3 (unnecessary capitalization and suggested answer omitted).

This Court reviews a trial court's permanency determinations for an abuse of discretion. *See Interest of J.B.*, 296 A.3d 1234, 1238 (Pa. Super. 2023). In this context, an abuse of discretion occurs only if the record reflects that the court's judgment was manifestly unreasonable, it did not correctly apply the law, or its action was the result of partiality, prejudice, bias or ill will. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa. Super. 2019). We must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record," but we are not bound by the trial court's "inferences or conclusions of law." *In the Interest of R.J.T.*, 9 A.3d 1179,

1190 (Pa. 2010). This Court defers to the trial judges, "who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." **Id**. We are "not in a position to reweigh the evidence and the credibility determinations of the trial court." **Id**.

Permanency goal change proceedings are governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-75. In particular, Sectiom 6351(f) mandates that a trial court consider a number of discrete factors in adjudicating a goal change petition including, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the appropriateness, feasibility, and extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) the likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. **See J.B.**, **supra** at 1239 (citing **In re A.B.**, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011)); **see also** 42 Pa.C.S.A. § 6351(f)(1)-(5), (6), (9).

However, the polestar of any dependency matter must be the "safety, permanency[,] and well-being of the child," which takes precedence "over all other considerations, including the conduct and the rights of the parent." **In the Interest of M.T.**, 101 A.3d 1163, 1175 (Pa. Super. 2014). Therefore,

"[w]hile parental progress toward completion of a permanency plan is an important fact, it is not to be elevated to determinative status, to the exclusion of all other factors." *Id*. In short, "a child's life cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d 818, 824 (Pa. Super. 2006).

A careful review of the record supports changing Child's goal from reunification to adoption. Primarily, Ms. Gregory testified that, following her stroke, Guardian is unable to live independently because she cannot take care of herself.[4] N.T. at 12-13. Upon discharge from the nursing home in April 2022, Guardian began living with L.P. *Id.* at 7. At this time, CYS had already removed Child from L.P.'s care. *Id*.

Ms. Gregory further stated that Guardian has conveyed that she intends to move in with R.G. once his home is made wheelchair accessible. *Id.* at 13. However, Ms. Gregory testified that R.G., "is an indicated perpetrator of sexual abuse against one of [Guardian's] daughters" as well as L.P.'s daughter, who is Guardian's granddaughter. N.T. at 11. CYS requested that R.G. obtain an offender's assessment through Project Point of Light. *Id*. The assessment revealed that he is attracted to adolescents aged twelve to seventeen. *Id.* at 12.

_____

[4] The record does not detail the extent of Guardian's limitations following her stroke. However, Ms. Gregory testified that Guardian is currently in a wheelchair and relies on L.P., her paramour, R.G., and an unnamed individual to assist her. N.T. at 8.

Nevertheless, on direct examination, Ms. Gregory emphasized that Guardian continues to be in a relationship with R.G. and denies that he is a perpetrator of sexual abuse, as follows.

> Q: Does [CYS] believe that it would be unsafe for [Child] to have exposure to [R.G.] due to his history as an indicated perpetrator of sexual abuse and his interest in girls of her age range?
>
> A: That is correct.
>
> Q: Has this safety issue been explained to both [Guardian] and [L.P.]?
>
> A: Yes.  I have spoken multiple times with [Guardian] about this. She continues to report that it's not an issue and that he is not a sexual perpetrator, or a perpetrator of sexual abuse, and then also L.P. indicates that she needs [R.G.] in the home to help take care of [Guardian].

*Id.* at 12.

Ms. Gregory further testified that, throughout Child's dependency, L.P.'s home, where Guardian resided from the time she left the nursing home following her stroke through the time of the hearing, remained in deplorable condition.  *Id.* at 8-10, 14.  She testified as follows on direct examination.

> Q: When you've conducted home visits to that home do issues with cleanliness and home conditions continue to exist?
>
> A: Yes.  There is a cockroach infestation that has been there [] the entirety of the case, as well as about nine cats in the home and, like, animal feces and urine that's not in litter boxes, like, throughout the home and just overall cleanliness of the home.
>
> Q: Has [CYS] assisted the family in paying for pest removal?
>
> A: Yes.  We've been paying for an exterminator since October of 2022 and the cockroach infestation is still a concern.  The exterminator reported to [CYS] that [L.P.] will do the bare

> minimum of cleaning in between sprays, so that is hindering from the cockroach infestation being taken care of.
>
> . . .
>
> Q: If [Guardian] were to return to [R.G.'s] home, are there any additional concerns with the condition of that home?
>
> A: Yes. The floor is caving in and there are holes in the walls from rat infestation.

*Id*. These deplorable conditions, along with R.G. living in L.P.'s home, prevented visits from occurring at the residence. *Id.* at 15. Accordingly, visitation mostly consisted of weekly two-hour visits *via* Zoom. *Id*. Further, CYS referred Guardian to Clarion County Aging and Adult Services, an agency that could provide Guardian with a case manager to help her obtain assisted living. *Id.* at 10. However, Guardian refused these services and explained to Ms. Gregory it is because L.P. cannot afford to live without her. *Id*.

Child had resided with Guardian since she was two years old, and Ms. Gregory testified that following her adjudication, she was diagnosed with ADHD, PTSD, intermittent explosive disorder, an intellectual disability, and adjustment disorder with emotional and conduct disturbance. *Id.* at 6, 16. Ms. Gregory testified as follows with respect to Child's progress while residing at Keystone.

> Q: And did Keystone have resources to assist with her mental health diagnosis?
>
> A: Yes.
>
> Q: And how has she been doing since [being] placed at Keystone?

A: She does well.  She has minor behaviors, like sometimes she won't listen and then sometimes she'll swear, but she's not put in restraints, they just, like, take away points and they put her in her room, like a timeout to calm down.

*Id.* at 16-17.  Ms. Gregory further testified that Child has an independent education plan for life skills at the high school she attends.  *Id.* at 17.

Mr. Matusz, Keystone program manager, confirmed that Child has "flourished" at the facility because of the facilities regimented structure.  *Id.* at 29-30.   Mr. Matusz stated that Child receives "ongoing psychiatric care in the form of medication management, weekly trauma therapy, [and] various life skill programs that she receives through her [high school]."  *Id.* at 29.  He emphasized that changes in routine "often times provoke" negative behaviors and that she requires "frequent redirection or prompting or oversight" due to her intellectual delays.  *Id.* at 31.

Regarding Child's preference, Ms. Gregory testified that Child sometimes indicates that she wants to reunify with Guardian, but also talks about the type of family she wants to live with.  *Id.* at 18-19 ("She told me that she wanted two moms, and then if we couldn't find two moms then to find [] a mom and a dad.").   Mr. Matusz concurred with Ms. Gregory's testimony, stating that Child has oscillated between desiring to return to Guardian and being adopted.  *Id.* at 35.  Finally, Ms. Gregory informed the court that, although Child is not in a pre-adoptive home, she has matched her with a potential permanent resource.  Thus, Ms. Gregory testified that

- 11 -

changing Child's goal to adoption would allow CYS to provide Child with much needed permanency.[5] *Id.* at 20.

Overall, although Guardian participated in some of her goals, she failed to complete her most significant objectives, namely, eliminating the risk of sexual abuse in the home; addressing Child's trauma associated with related incidents; and maintaining a safe and clean home environment.  As indicated, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."  *N.C.*, 909 A.2d at 824.   Guardian has consistently denied that R.G. is a perpetrator of sexual abuse.  In addition, she has not utilized CYS resources to maintain a clean home or obtain assisted living services.

Based on the foregoing, we discern no abuse of discretion by the trial court in determining that it is in Child's best interest to change her permanency goal to adoption.  Further, our independent review of the certified record reveals no preserved non-frivolous issue that would arguably support these appeals from the decrees.  Therefore, we grant Attorney Grape's petition to withdraw from representation and affirm the appeal from the order changing Child's permanency goal to adoption.

Petition to withdraw granted.  Order affirmed.

---

[5] Mother and Father are not reunification options for Child.  Mother told CYS she is not an option, and Father has not contacted CYS and did not participate in the dependency proceedings.  N.T. at 5-6.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/21/2023