J-A20026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF A.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| APPEAL OF A.W., MOTHER | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 122 MDA 2019 |

Appeal from the Dispositional Order Entered December 14, 2018
In the Court of Common Pleas of Northumberland County Juvenile
Division at No(s):  CP-49-DP-0000136-2018

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED OCTOBER 01, 2019**

A.W. (Mother) appeals from the order adjudicating her six-year-old child, A.H. (Child), dependent. We affirm.

Children and Youth Services of Northumberland County ("CYS") became involved with the family in 2017. In January 2018, CYS "received a referral . . . that there was no heat in the home and the natural mother was allowing drug users in the home" with Child. Dependency Petition, filed 12/07/18, at 3.[1] Upon investigation, CYS confirmed that Mother was in fact without heat and was able to obtain heating oil for Mother. *Id.* In September 2018, Mother contacted CYS "stating she was in need of a fridge and stove." *Id.* In October 2018, CYS "received a referral that [Child] was dirty and smelled when she attended school." *Id.* at 4. That same month, CYS "received a Child Protective

_____

[1] Dependency petition states that Child's other siblings live in North Carolina. *See* Dependency Petition at 2.

Services referral alleging sexual abuse of the minor child, . . . by the natural mother's paramour." *Id.* Travis Perkins is Mother's boyfriend. *Id.* The referral alleged that Perkins "was watching pornography and masturbating while in the presence of [Child]; it was also alleged that [Perkins] touched [Child] inappropriately." *Id.* Subsequently, a safety plan was put in place in which it was ordered that Perkins "not be in the presence of Child." *Id.*

In November 2018, CYS received another referral that Perkins touched Child inappropriately. *Id.* The referral alleged "that the natural mother started taking [Child] to friend's [sic] houses so that [Perkins] could visit her residence." *Id.* CYS filed a Shelter Care application in December 2018 alleging that Child was "without proper parental care or control, subsistence, education as required by law." *See* Shelter Care Application, filed 12/05/18. On December 7, 2018, CYS filed a dependency petition, again alleging that Child was without parental care or control. *See* Dependency Petition. That same day, the trial court entered an order that Child be placed in foster care and scheduled a hearing for December 14, 2018. *See* Shelter Care Order, filed 12/07/18. The following testimony was presented at the adjudicatory hearing.[2]

Child's occupational therapist, Mary Catherine Kelley, testified that during one of their sessions, Child "began talking about staying at a friend's house because she can't be around daddy anymore." N.T., Adjudication

_____

[2] Child was represented by Cindy Kerstetter, Esq. as the guardian *ad litem*.

Hearing, 12/14/18, at 3, 5. Child explained that this was due to him touching her private area. *Id.* at 5. She said, "I was sleeping in mommy and daddy's bed and mommy woke up to the bed moving and daddy touching me." *Id.* at 5. Child also informed Kelley that her dad was named Travis. However, Travis is not Child's biological father but rather Mother's boyfriend. *See* Dependency Petition at 4; *see also* N.T. at 36. (testimony from caseworker Michelle Jones of identity of Child's natural father).

During another session on October 4, 2018, Kelley noticed a smell coming from Child. *Id.* at 5, 6. She described the smell as "very sour smelling, very - - it just was a body odor I've never smelled on a child that age." *Id.* at 10. Kelley then sent Child to the nurse's office and the nurse provided her with some wipes to clean herself. Kelley also dry shampooed and brushed Child's hair and gave her clean clothes to wear*. Id.* at 5, 6. Kelley also testified "[t]here's been a few times where I noticed [Child's] clothes were dirty" and "[t]here's some times that she came into school several days in a row in the same outfit, nothing changed, the same stain." *Id.* at 6, 10.

Mother's case worker, Michelle Jones, testified that she initially became involved with Child and Mother when Mother informed Jones that she was in need of a refrigerator and stove. *Id.* at 12, 13. Jones testified that the next time she was involved with Child and Mother was when she received "a referral in September that [Child] had came to school and that her clothes were dirty and that she had an awful smell." *Id.* at 13. She also testified that "the teacher seen her in the street in the morning time playing outside with no shoes on

and she had the same clothes on as she had given her." *Id.* at 14. This incident occurred in October 2018. *Id.* at 32. Jones was unsuccessful in reaching out to Mother but later was notified that Mother "was out of town and she had left [Child] with a babysitter." *Id.* When Jones finally spoke with Mother, Mother informed her that she left Child with a babysitter but "the babysitter did not do what she was supposed to do." *Id.* at 15. Mother did not inform Jones of the identity of the babysitter and Jones did not see the babysitter. *Id.* at 25. Mother also informed Jones that she often leaves Child with a babysitter so she can go "back and forth to Virginia with a custody issue with her other children." *Id.* at 25, 32.

Jones also testified to one occasion where she "needed to pick up a food order for [Mother] because there was no -- there was no food in the home." *Id.* at 16.

The next time Jones became involved with Mother and Child was when she received a referral from CPS in reference to Child being inappropriately touched. *Id.* She received this report in either October or November 2018. *Id.* at 23. Following this referral, a safety plan was put in place "that [Perkins] would not be around [Child]." *Id.* at 16. After the safety plan was put in place, Jones received a referral in December that "[M]other had broken the safety plan and that the boyfriend had been in the home around [Child]." *Id.* at 16, 23. Jones stated, "I could not prove that the safety plan was broken." *Id.* at 20. Jones and a CPS caseworker followed up with Mother at her home. During their visit, Perkins was in the home and Child was at a neighbor's house down

the street. *Id.* at 17. Mother told Jones that Child and her boyfriend, Perkins, had never been in the home together following the safety plan. *Id.* At the time of the adjudication hearing, Mother was still involved with Perkins. *Id.* at 34.

Jones also testified about her concerns regarding conditions in Mother's home. She stated, "I just did a home visit on 12/12[/18]. I went into [Mother's] refrigerator and there was nothing in the refrigerator to eat." *Id.* at 18. She also testified "[a]t one time [Mother] had a dog, and every time I went into the home, it was a mess in there where he had gotten ahold of some things and was tearing some things up." *Id.*

Jones testified that Child was interviewed by the Child Advocacy Center (CAC) and "stated that mommy told her that daddy touched her when she was three years old. She also stated that she was afraid to talk about the touching because she didn't want to get into trouble" with Mother. *Id.* at 21, 29. "Daddy" on this occasion referred to Child's biological father. *Id.* at 22.

At the time of the hearing, Child was placed in foster care. *Id.* at 35. Ms. Jones testified that while in foster care, Child overate to the point of making herself vomit three times during her first night in the resource home. *Id.* at 35-36.

The trial court determined that CYS had met its burden of proving by clear and convincing evidence that Child was dependent. The court explained:

> So there's obviously something going on here that I have real
> concerns with. The other thing is, the kid's out in the street with
> no shoes on unsupervised. [Mother] goes away for a week. Hey,
> whoever [Mother] picks as the supposed babysitter, that's on her.
> And if that babysitter didn't do what they were supposed to do,

that's also on [Mother]. The kid's out in the street alone running around in October with no shoes on. That's a real concern for me. No food in the refrigerator.

*Id.* at 43-44. This timely appeal followed.

Mother raises the following issue: "Whether the trial court erred by adjudicating [Child] dependent?" Mother's Br. at 8.

We review the grant of a dependency petition for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *Id.* However, we are not bound by the trial court's "inferences or conclusions of law." *Id.*

The Juvenile Act defines a dependent child as a child "without proper parental care or control, subsistence, education as required by law or other care or control necessary for [the child's] physical, mental or emotional health, or morals." 42 Pa.C.S.A. § 6302. "In order to adjudicate a child dependent, the court must determine that the above definition has been met by clear and convincing evidence." *In re L.V.*, 127 A.3d 831, 835 (Pa.Super. 2015). Lack of proper parental care or control may be established where there is evidence that the parent's conduct "places the health, safety or welfare of the child at risk, including evidence of the parent's . . . use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk." *Id.* Additionally, "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets [the] statutory definition of dependency." *In re M.T.*, 101 A.3d 1163, 1173

(Pa.Super. 2014) (*en banc*) (quoting **In re G.T.**, 845 A.2d 870, 872 (Pa.Super. 2004)). Clear and convincing evidence is defined as evidence that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." **In re A.B.**, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting **In re C.R.S.**, 696 A.2d 840, 843 (Pa.Super. 1997)).

Here, Mother maintains that CYS failed to meet its burden of proving "abuse or adequate allegations of neglect." Mother's Br. at 16. She argues that "[t]he mere fact that [Mother] reached out to NCCYS, asking for help in buying food for the house is not abuse or neglect of [Child]. In fact it is the opposite of abuse or neglect." **Id.** at 15. She further claims that Jones' testimony regarding Child being outside without shoes was "not reliable." **Id.** at 12.

Here, the trial court did not abuse its discretion in adjudicating Child dependent. CYS established by clear and convincing evidence that Child is without proper parental control. The evidence established that Mother placed Child's welfare at risk on multiple occasions. First, Jones testified that Child was outside, unsupervised and without shoes, in the month of October. The trial court credited this testimony, stating that it was concerned that "[t]he kid's out in the street alone running around in October with no shoes on." N.T. at 44. Mother's only explanation for this incident was that she was out of town and the babysitter she arranged to supervise Child "did not do what she was supposed to do." **Id.** at 15. However, it was part and parcel of Mother's

parental duties to choose a reliable and responsible babysitter and the babysitter's failings redound to Mother. Although this evidence of a single instance of the babysitter's failure to adequately supervise Child is not utterly dispositive on its own, it was some evidence of dependency and the trial court did not err in relying on it.

Second, Mother failed to provide for Child's physical health, as exhibited by Child showing up to school on more than one occasion with a "sour smell," dirty clothes, and at times wearing the same clothes day after day. Furthermore, Jones testified to one occasion where Mother had no food in the house and upon Child leaving the custody of Mother, Child overate to the point of vomiting three times in one day. Additionally, as the trial court stated, at the time of the hearing there was at least one allegation that Mother's boyfriend had perpetrated sexual abuse on Child. Despite this allegation, Mother continued a relationship with her boyfriend and would send Child away so that the boyfriend could visit.

The above evidence supports the trial court's finding that Mother's conduct "place[d] the health, safety or welfare of the child at risk." 42 Pa.C.S.A. § 6302. The court did not abuse its discretion adjudicating Child dependent.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/01/2019