J-A28021-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: J.S., A MINOR | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| APPEAL OF:  L.W., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 957 MDA 2021 |

Appeal from the Decree Entered July 7, 2021
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s):  2020-6726

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                **FILED JANUARY 06, 2022**

Appellant L.W. (Mother) appeals from the order granting the petition of Lycoming County Children and Youth Services (the Agency) and involuntarily terminating her parental rights to J.S. (the Child).  We affirm.

The orphans' court set forth the following findings of fact:

[The Child] was born [in] April [of] 2018.  He is the child of [S.S. (Father)] . . . and [Mother] . . . .  Mother and Father were not married at the time of the Child's birth.

The Agency has extensive history with this family, with whom they have been involved since 2015.  The Agency's prior involvement resulted in the voluntary termination of Mother's parental rights to her two older children, one of whom was also Father's child. The Agency filed a dependency petition on July 22, 2019, alleging that Mother was demonstrating the same pattern of neglectful parenting of the Child as she did with her two older children.  More specifically, the petition alleged that the Child had been diagnosed with failure to thrive, and Mother did not follow through with doctors' directions regarding the Child's milk intolerance.   The

_____

[*] Former Justice specially assigned to the Superior Court.

petition also alleged that Mother failed to pick up prescribed medications and formula for the Child in a timely manner and missed several scheduled medical appointments for the Child.

The Child was placed in the emergency custody of the Agency on July 31, 2019, due to Mother's lack of follow-through with medical treatment, housing, and parenting. A shelter care hearing was held on August 2, 2020, at which time it was determined that sufficient evidence was presented to prove that return of the Child to the home of Mother and Father would not be in the Child's best interest.

A dependency hearing was held on August 12, 2019, after which the [dependency] court adjudicated the Child dependent. The [dependency] court noted significant concerns in regard to Mother's lack of insight with regard to the Child's medical issues, and determined that she had not placed his medical needs as a priority. As the [dependency] court found that allowing the Child to remain in the home of Mother and Father would be contrary to the Child's welfare, legal and physical custody of the Child was to remain with the Agency and the Child was to remain the approved kinship home.[1] Mother was directed to focus on feeding the Child by providing foods at visits that the Child can eat, to maintain suitable housing, continue to attend all medical appointments with the Child, maintain regular contact with the Agency, maintain contact with the Outreach worker, and continue to work with Expectations for Women.

A permanency review hearing was held on December 6, 2019. The [dependency] court noted that there had been moderate compliance with the permanency plan, in that Mother maintained suitable housing and had appropriate home conditions. Mother cooperated with Outreach services and consistently attended visits with the Child. Mother was found to have made some progress towards alleviating the circumstances which necessitated placement, but had made no efforts to secure employment. During this review period, Mother requested visits in her home and also requested overnight visits. Overnight visits were not approved but the Agency was directed to transition Mother's visits from the visitation center to supervised visits at Mother's home. Following the hearing, the [dependency] court reaffirmed

---

[1] The Child was placed with the foster parents who had adopted his biological siblings, T.B. and M.B. N.T. Hr'g, 6/7/21, at 78-79.

dependency and the Child remained in the legal and physical custody of the Agency with continued placement in his foster care home.

A permanency review hearing was held on March 10, 2020. The [dependency] court found that there had been moderate compliance with the permanency plan by Mother and moderate progress towards alleviating the circumstances which necessitated the original placement. During the review period, Mother maintained her housing and continued to have appropriate home conditions, despite having sizeable outstanding utility bills. Mother was cooperative with Outreach services and attended all medical appointments for the Child. Mother enjoyed supervised visits in her home, and her care of the Child improved under the Agency's guidance, but the guardian *ad litem* [(GAL)] voiced concern about Mother's capability to independently care for the Child and requested that an evaluation be conducted by Dr. Denise Feger at Crossroads Counseling. The [dependency] court ordered Mother to undergo the evaluation for the purpose of determining Mother's ability to properly care for the Child. The [dependency] court remained concerned about Mother's lack of employment, and her lack of knowledge of paying bills and budgeting. Following the hearing, the [dependency] court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home.

A permanency review hearing was held on June 29, 2020. The [dependency] court found that Mother had minimal compliance with the permanency plan and made minimal progress towards alleviating the circumstances which necessitated the original placement. During the review period, Mother maintained housing and continued to have appropriate home conditions. However, significant concerns were raised about Mother's behaviors during the [COVID-19] pandemic, which included allowing multiple individuals to live in her house . . . . Mother failed to undergo the [c]ourt-ordered evaluation with Dr. Denise Feger, despite multiple attempts by Dr. Feger's office to contact her to schedule a video evaluation due to the pandemic. Additionally, although Mother was generally cooperative with Outreach services, Mother refused assistance to prepare for job searching and interviewing. The [dependency] court remained concerned about Mother's lack of motivation to obtain employment, and the impact her limited income has on her ability to meet her financial obligations. Following the hearing, the [dependency] court reaffirmed dependency and legal and physical custody of the Child remained

with the Agency for continued placement in his current foster home.

A permanency review hearing was held on September 15, 2020. The [dependency] court found that Mother had minimal compliance with the permanency plan and made minimal progress towards alleviating the circumstances which necessitated the original placement. During the review period, Mother maintained housing and continued to have appropriate home conditions[,] but Mother had no understanding of her living expenses and relied completely on her father to handle the payment of her expenses. Mother was cooperative with Outreach Services. However, Mother was still not actively seeking employment and had limited income through Social Security. Mother no-showed [for] six visits [with the Child during] this review period and no-showed for two appointments with Dr. Feger prior to finally undergoing her evaluation. Following the hearing, the [dependency] court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home. With some hesitation, the [dependency] court granted the Agency's Motion for Compelling reasons not to proceed with filing a petition to terminate parental rights. Mother was strongly encouraged to take action to accomplish the recommendations outlined in Dr. Feger's evaluation, and cautioned that if she did not become more proactive in addressing the areas of concern the [dependency] court would not see a basis to grant compelling reasons in the future.

A permanency review hearing was held on December 15, 2020. The [dependency] court found that Mother had moderate compliance with the permanency plan and made moderate progress towards alleviating the circumstances which necessitated the original placement. During the review period, Mother maintained housing and continued to have appropriate home conditions. Mother reported that she recently obtained employment, but had not begun working. In the limited opportunities that Mother had available due to COVID-19, Mother demonstrated improvement in feeding the Child appropriate foods with regard to his allergies. Following the hearing, the [dependency] court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home. Mother was directed that prior to the next hearing she shall either obtain and start employment sufficient to support herself and the Child or provide documentation that her disability income is sufficient to do so.

A permanency review hearing was held on March 12, 2021, and March 18, 2021. The [dependency] court found that Mother had moderate compliance with the permanency plan but made only minimal progress towards alleviating the circumstances which necessitated the original placement. During the review period, Mother maintained housing and continued to have appropriate home conditions. Mother consistently attended visits with the Child. Mother had not completed the neuropsychological evaluation or scheduled an appointment at CSG for a Peer Specialist, as recommended by Dr. Feger. The [dependency] court found that Mother was basically in the same position that she was in at the time of the last review hearing and that she continually failed to follow-through with items that the Agency has recommended and the [dependency] court has directed. Following the hearing, the [dependency] court reaffirmed dependency and legal and physical custody of the Child remained with the Agency for continued placement in his current foster home. The [dependency] court further found that there were no longer compelling reasons to not pursue termination of Mother's parental rights. The [dependency] court advised Mother that she was reaching a point in the case where the Agency most likely would be filing a petition to terminate her parental rights, and if she wished to prevent that, she needed to take immediate action and be 100 percent compliant with all of the directives that have been outlined by the Agency.

A permanency review hearing was held on April 16, 2021. The [dependency] court found that Mother had minimal compliance with the permanency plan and had made no progress towards alleviating the circumstances which necessitated the original placement, in that she continued to be at the same level of progress since the Child was placed. During the review period, Mother did verify her employment. However, her employment may have been a factor in Mother missing some visits with the Child, which resulted in Mother being placed on call-in status with regard to visits. At visits, Mother had not made any significant improvements and continually needed prompting by the staff with regard to the food that she brings for the Child in light of his milk allergy. Mother had not obtained the neuropsychological evaluation and could not be referred to one until she found a primary physician. Mother had made no attempts to find a family physician, nor had she attempted to make arrangements for care for the Child if he was returned to her care. Following the hearing, the [dependency] court reaffirmed dependency and legal and

- 5 -

physical custody of the Child remained with the Agency for continued placement in his current foster home.

The Agency filed a petition for involuntary termination of parental rights on April 1, 2021. A petition for change of goal to adoption was filed on May 12, 2021. The petition for involuntary termination alleged termination was warranted under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). The hearing on the petition was held on June 7, 2021, and June 28, 2021.[2] [Angela Lovecchio, Esq. served as the Child's GAL and legal counsel.[3]]

\* \* \*

There is no dispute that Mother has been very vocal about her desire to maintain a place of importance in her [c]hild's life and to have the Child returned to her custody. Mother's visits began as "observed," meaning that staff was always present/nearby to offer support and assistance as needed, and remained at that status at the time of the hearing. Mother visits with [the] Child 2 days per week for 2 hours at a time. For a short time, the visits occurred in Mother's home under Agency supervision; however those visits were changed to video visits following an issue with bed bugs in Mother's home and, later, due to COVID-19. In-person visits have resumed at the Agency's family support center.

William Pearson, visitation caseworker for the Agency, testified that Mother's strengths were her attendance rate, which was approximately 91% and that Mother and the Child had a nice relationship and enjoyed each other's company. Due to several no-shows at the scheduled visitation time, the Agency notified

---

[2] "Father signed a consent to adopt on April 16, 2021, and was not present at the hearings." Orphans' Ct. Op. & Decree at 1 (formatting altered). Father and his counsel were excused from the hearings. *Id.*

[3] The orphans' court found that because of the Child's age, the Child could not express a position regarding this termination matter and there was no conflict for Attorney Lovecchio serving as both the GAL and legal counsel for the Child. Order, 5/4/21. The appointment of the GAL as the Child's legal counsel complies with the mandate of 23 Pa.C.S. § 2313(a) and *In re Adoption of L.B.M.*, 161 A.3d 172, 183 (Pa. 2017), and this Court may not *sua sponte* review whether there was a conflict in the Child's best and legal interests. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020). In any event, the record shows there was no conflict in the Child's best and legal interests.

Mother by letter dated August 31, 2020, that she was required to call the Agency prior to each visit to notify them of her intent to attend the visit. Because her visit on Thursday mornings is scheduled to begin at 8:00 a.m., Mother is required to notify the agency by 4:30 p.m. on Wednesday if she plans to attend. Recently, Mother has missed visits on Thursday morning because she has failed to call in on Wednesday. Mother has attributed her failure to make this call to having to work late at her job.

* * *

Although Mr. Pearson testified that Mother has supplied safe supervision and appropriate redirection during the visits, he acknowledged that it has been nearly 2 years since the visits started and it took Mother nearly that long to grasp how serious the Child's milk allergy is, and how to read labels to ensure that she is not providing him with foods that have milk or milk by-products as an ingredient.

* * *

Bruce Anderson, licensed psychologist under contract with the Agency, performed an evaluation of Mother on October 21, 2020. Mr. Anderson indicated that Mother's ability to abstract was rather limited. He testified that this means when the Child presents with difficult or different issues or behaviors, Mother may experience difficulties figuring out what to do. He opined that Mother may become overwhelmed when the needs of the Child go beyond the normal routine, and that only if Mother has full-time support and not just occasional service providers would she be capable of handling these challenges. Mr. Anderson recommended that Mother continue working with her Outreach worker to maintain suitable and appropriate housing, continue having her father [*i.e.*, the Child's maternal grandfather,] be her payee and assist her with payment of her expenses, and seek the assistance of the Office of Vocational Rehabilitation (OVR) if she wished to obtain employment. Additionally, an addendum to the report included the recommendation that Mother obtain a neuropsychological evaluation, which may have shed light on the root causes of Mother's inability to follow-through with things and learn from her past mistakes when it comes to appropriately caring for her children.

In March of 2020, Mother was ordered to undergo a behavioral health assessment with Dr. Denise Feger of Crossroads Counseling. At the time of the permanency review hearing in June

2020, Mother still had not completed the evaluation. Dr. Feger testified that her office remained open during the entire pandemic for virtual services but that they had a difficult time getting ahold of Mother. Mother no-showed 2 previously scheduled appointments before finally attending the evaluation on September 4, 2020. Dr. Feger testified that the purpose of the evaluation was to determine whether Mother has the ability to independently care for the Child. Among other things, Dr. Feger recommended that Mother do the following:

1. Obtain a peer specialist

2. Engage in OVR services

3. Engage in out-patient counseling

4. Obtain a mental health intake

5. Create a partnership with the foster parents

6. Continue with Outreach services to address parenting and protective capacity

7. Obtain a neuropsychological evaluation

*    *    *

Aimee Gatzke, Agency caseworker, testified regarding the goals established for Mother in the service plan and Dr. Feger's recommendations and the level of progress Mother made towards achieving those goals. Regarding the need for safe and stable housing, Ms. Gatzke testified that Mother was able to maintain her housing. However, there was an issue with bed bugs in Mother's home which Mother became aware of in November of 2020 but did not address until February of 2021. Additionally, Mother's finances are managed by her father as her payee, and while her rent is current, her limited Social Security income does not leave Mother with sufficient income to pay all her expenses. Mother has no understanding of her actual expenses beyond her rent, and for much of the length of her involvement with the Agency lacked the motivation to obtain employment to supplement her Social Security income. Despite repeated recommendations by her Outreach worker, ongoing caseworker, and Dr. Feger to engage the services of OVR, Mother never followed through with making an appointment, and testified that she obtained employment on her own. Mother failed to understand that the recommendation was made so Mother could receive assistance finding not just a

- 8 -

job, but sustainable employment that will not interfere with her government benefits and allow her to adequately provide for her own needs and those of the Child.

Mother did not follow-through with the recommendation that she form a partnership with the foster family. Although both Mother and the foster mother testified that Mother's communication has increased to approximately one time per week, the conversations were often superficial and repetitive, and not frequent enough for Mother to gain an understanding of what the foster parents have done to resolve/manage the Child's medical and dietary needs. Mother testified that she turned in the paperwork to obtain a peer specialist but has "gotten nowhere" with it. Mother did not attempt to schedule counseling until March of 2021 despite being recommended to do so in September of 2020. Mother still has not undergone the neuropsychological evaluation that was recommended. When questioned about her lack of urgency to accomplish these tasks and her lack of follow-through, Mother is unable to provide an explanation.

*    *    *

[Dr. Feger performed a fitness/bonding assessment regarding Mother and the Child on April 6, 2020.] Dr. Feger testified that there is a bond between Mother and the Child, and that the Child identifies Mother as his "mommy." However, Dr. Feger's evaluation and subsequent testimony at the hearing explained that the Child does not view [Mother] as [his] "mommy" in the traditional sense because his relationship with Mother is not one that relates to a primary caretaker. Child spends only a couple hours per week with Mother, and their time together is always supervised. Mother cares for the Child "moderately superficially" in the visitation setting but there are a secondary set of caregivers — the foster parents — who have served a far greater role for the Child.

Orphans' Ct. Op. & Decree, 7/7/21, at 1-9, 11-15, 18 (some formatting altered).

On July 7, 2021 the orphans' court issued an opinion and decree involuntarily terminating Mother's parental rights to the Child pursuant to Section 2511(a)(1), (2), (5), (8), and (b). *Id.* at 20-23.

On July 19, 2021, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion adopting the reasoning of its July 7, 2021 opinion and decree. *See* Orphans' Ct. Op., 7/29/21, at 1-2.

Mother raises the following issues for our review:

1. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(1) when [Mother] has not failed to perform parental duties of a period of at least six months and made every effort to have a relationship with her child.

2. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(2) when there was insufficient evidence that the Child was without essential parental care, control or subsistence necessary and causes of the incapacity cannot or will not be remedied as [Mother] made substantial progress to remedy the incapacity and provide the Child with essential parent care, control and subsistence necessary.

3. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(5) and 23 Pa.C.S. § 2511(a)(8) in finding that (1) the Child has been removed from parental care for at least six months and twelve months respectively; (2) the conditions which led to removal or placement of the Child continues to exist; (3) and termination would best serve the needs and welfare of the Child when [Mother] has remedied the conditions and the needs and welfare of the Child would not be best served by termination.

4. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S.[] § 2511(b), when there is a bond between the Child and [Mother] and the best interests of the Child would not be served by termination.

Mother's Brief at 7-8 (formatting altered).

- 10 -

Our Supreme Court has explained that

appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

This Court has explained:

Termination of parental rights is governed by section 2511 of the Adoption Act, [23 Pa.C.S. § 2511,] which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

- 11 -

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. . . .

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid.

\* \* \*

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a).

**In re M.T.**, 101 A.3d 1163, 1178-79 (Pa. Super. 2014) (*en banc*) (citations omitted and formatting altered).

We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.L.G.**, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citations and quotation marks omitted).

Although Mother challenges the orphans' court decision involuntarily terminating her parental rights pursuant to Section 2511(a)(1), (2), (5), and (8), because we may affirm with regard to only one subsection, we address the orphans' court's decision under subsection (a)(8) because it is dispositive. **See M.T.**, 101 A.3d at 1179.

## Section 2511(a)(8)

Mother contends that the Agency failed to meet its evidentiary burden with respect to Section 2511(a)(8), and the orphans' court erred in terminating her parental rights under that subsection. Mother's Brief at 30-32. Mother acknowledges that the Child had been in care for more than twelve months, which satisfies the time requirement of Section 2511(a)(8). *Id.* at 31. However, Mother argues that the conditions which led to the placement of the Child no longer exist. *Id.* at 30-31. Specifically, Mother claims that she had a 91% attendance rate for visitation with the Child both in-person and via video calls. *Id.* at 31. Mother also notes that prior to the COVID-19 pandemic, Mother had visitation with the Child at her home. *Id.* Mother asserts that she made progress in providing appropriate foods for the Child and there were no safety issues raised during her visitation sessions. *Id.* at 31-32. Further, Mother asserts that she has "maintained her housing, cooperated with Outreach services, maintained her father as her payee, obtained employment, underwent a Psychological Evaluation with Bruce Anderson and a Behavioral Health Evaluation with Dr. Feger." *Id.* at 32. Mother concludes that she made significant progress in meeting her goals and remedying the conditions that led to the Child's removal from her care. *Id.*

The Agency and the GAL did not file appellee briefs, and instead submitted letters indicating that they relied on the orphans' court opinion.

Section 2511(a)(8) provides:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *   *   *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

There are three factors that must be established in order to terminate parental rights under this subsection:

> an agency must prove by clear and convincing evidence that (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.

*C.L.G.*, 956 A.2d at 1005 (citations and quotation marks omitted).

The *C.L.G.* Court explained that with respect to the second factor under Section 2511(a)(8), "a reasonable possibility that" the parent "could remedy the condition" that led to the child's removal is irrelevant to an analysis under Section 2511(a)(8), "which requires only that the conditions continue to exist, not an evaluation of parental willingness or ability to remedy them." *Id.* at 1007. Further, this Court has explained that "a child's life simply cannot be put on hold in the hope that a parent will summon the ability to handle the responsibilities of parenting" and the courts "will not toll the well-being and

permanency of [a child] indefinitely." *Id.* (citation omitted and formatting altered).

As to the third factor under subsection (a)(8), this Court explained that "the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent." *Id.* at 1008-09. Further, "while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the needs and welfare of the child, [a court is] required to resolve the analysis relative to Section 2511(a)(8)" before addressing Section 2511(b). *Id.* at 1009.

Here, the orphans' court concluded:

> The court finds that the Agency has proven by clear and convincing evidence that grounds for termination of Mother's parental rights exist under [Section 2511(a)(8)]. The Child was removed from the home and placed in the legal and physical custody of the Agency on July 31, 2019, and has been in Agency's custody ever since. The Child had been removed from his Mother's care for approximately 20 months at the time of the filing of the petition for involuntary termination of parental rights. At each of the permanency review hearings for the Child, Mother was found to have only minimal to moderate compliance with the permanency plan and made no substantial progress towards alleviating the conditions which necessitated the Child's placement. As described above, Mother continues to experience the same difficulties meeting both her and the Child's needs as she did at the time of placement, despite numerous attempts by the Agency to connect her with services designed to enable and empower her to do so. Meanwhile, the Child has had his basic needs met by his [foster] family, and has flourished with proper medical care and nutrition, love, and support. It is clear to this court that termination of Mother's parental rights would best serve the needs and welfare of the Child.

Orphans' Ct. Op. & Decree at 17 (formatting altered).

As stated above, Mother does not dispute the first requirement of Section 2511(a)(8), *i.e.*, the Child has been removed from her care for more than twelve months. Briefly, the record establishes that the Child was placed in the emergency custody of the Agency on July 31, 2019, and the Agency filed the instant petition to involuntarily terminate Mother's parental rights on April 1, 2021, more than twelve months later. **See** N.T. Hr'g, 6/7/21, at 10, 112-21; **see also** Pet. for Involuntary Termination of Parental Rights, 4/1/21, at ¶ I(12), (41). Accordingly, the record supports the orphans' court's conclusion that the Agency established the first requirement of Section 2511(a)(8). **See C.L.G.**, 956 A.2d at 1005.

As to the second factor, the orphans' court found that "Mother continues to experience the same difficulties meeting both her and the Child's needs as she did at the time of placement, despite numerous attempts by the Agency to connect her with services designed to enable and empower her to do so." **See** Orphans' Ct. Op. & Decree at 17. The orphans' court credited the testimony of Ms. Gatzke and Mr. Anderson that Mother continued to struggle with managing her responsibilities to provide a stable and secure home for the Child and to meet the Child's daily needs. **See id.** at 12-14.

Our review of the records indicates that Ms. Gatzke testified that she is an Agency caseworker and has been assigned to the Child and Mother since September 2019. **See** N.T. Hr'g, 6/7/21, at 102-03. Ms. Gatzke described the problems with the Child's health and Mother's non-compliance with medical advice when the Child was in Mother's care. **See id.** at 104-08. Ms.

Gatzke testified Mother requires regular reminders to attend the Child's medical appointments (that the foster parents arrange), and Ms. Gatzke expressed concern that Mother would not remember to attend to the Child's needs without reminders from Agency caseworkers. *See id.* at 149-50. Ms. Gatzke believes that Mother could not establish a budget for herself. *See id.* at 119-22, 127-28. Further, Mother had not followed Agency advice about applying for public assistance and employment services. *See id.* at 133-34, 137.

Mr. Anderson, a licensed psychologist, evaluated Mother on October 21, 2020. *See id.* at 27. Mr. Anderson opined that Mother would be capable of caring for a child in the sense of following a normal routine, but she would have difficulty handling more difficult medical or behavioral problems involving the Child. *See id.* at 35.

Additionally, Dr. Feger testified that she performed a comprehensive behavioral health evaluation of Mother on September 4, 2020. *See* N.T. Hr'g, 6/28/21, at 6. Dr. Feger explained that she had "significant concerns connected to protective capacity largely connected to [Mother's] ability to meet the expectations from the original behavioral health evaluation, as well as her ability to advance her current visitation and maintain her home environment." *See id.* at 20. Dr. Feger observed that Mother appeared to be overwhelmed by managing both her own needs and goals and those of the Child at the same time. *See id.* at 27.

Accordingly, the record supports the orphans' court's finding that the conditions that led to the Child's removal from Mother's care continued to exist more than twelve months after the Child's removal. *See C.L.G.*, 956 A.2d at 1007. We note Mother's argument that she made significant progress in remedying the conditions during the time Child was in placement, preceding the filing of the instant petition. However, after considering Mother's efforts, the orphans' court concluded that her actions were not enough to remedy the conditions which led to placement. *See id.* (explaining that an analysis under Section 2511(a)(8), requires only a determination that the conditions which led to the removal or placement of the child continue to exist, and "not an evaluation of parental willingness or ability to remedy them").

As to the third element of subsection (a)(8), *i.e.*, that termination would best serve the needs and welfare of the Child, the orphans' court concluded that "the Child has had his basic needs met by his [foster] family, and has flourished with proper medical care and nutrition, love, and support[]" and that termination would best serve the Child's needs and welfare. *See* Orphans' Ct. Op. & Decree at 17.

N.B., the foster mother, testified that she and her husband provide for the Child's daily needs and that the Child developed from an underweight fifteen-month-old baby who did not yet walk or talk to a healthy three-year-old who enjoys playing with his biological siblings in their care. *See* N.T. Hr'g, 6/7/21, at 77-86. Further, Dr. Feger testified that she had significant concerns about Mother's lack of progress in working towards reunification. *See* N.T.

Hr'g, 6/28/21, at 25. As stated above, Dr. Feger observed that Mother appeared to be overwhelmed by managing both her own needs and goals and those of the Child at the same time. *See id.* at 27. However, Dr. Feger testified that she does not make recommendations regarding termination. *See id.* at 37.

Accordingly, the record supports the orphans' court's findings of fact and conclusions of law that the Agency provided sufficient evidence that the termination of Mother's parental rights would best serve the needs and welfare of the Child as required by the third requirement of subsection (a)(8). *See C.L.G.*, 956 A.2d at 1008-09.

In sum, having reviewed the record, the orphans' court's opinion, and Mother's arguments in this appeal, we conclude that the record supports the orphans' court's factual findings that the Agency presented clear and convincing evidence for terminating Mother's parental rights under Section 2511(a)(8). *See M.T.*, 101 A.3d at 1179.

**Section 2511(b)**

Mother contends that because the Agency failed to carry its burden to prove grounds for termination existed under Section 2511(a), the orphans' court should not have considered whether termination was appropriate under Section 2511(b). Mother's Brief at 34. Mother alternatively argues that the orphans' court erred by terminating Mother's parental rights because termination would sever a bond between Mother and the Child, causing injury to the Child. *Id.* at 34-36. Mother refers to Dr. Feger's testimony that Mother

and the Child have an established bond, although Mother's relationship to the Child is more like that of a child-care provider or a babysitter than that of a parent. *Id.* at 34-35. Mother also notes that Mr. Pearson testified that Mother has a good relationship with the Child, she regularly attends visitation with the Child, and those visits go well. *Id.* at 35-36.

On this record, we agree with the orphans' court that it acted within its discretion in concluding that the statutory grounds for termination have been met under Section 2511(a)(8). Therefore, we next review the orphans' court's conclusions as to whether the termination serves the needs and welfare of the Child, pursuant to Section 2511(b). *See M.T.*, 101 A.3d at 1178.

Section 2511(b) provides:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." *C.L.G.*, 956 A.2d at 1008 (citation omitted).

The *C.L.G.* Court explained that regarding Section 2511(b):

Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

Moreover, [t]he court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*Id.* at 1009-10 (citations omitted and formatting altered).

Further, this Court has explained that the existence of "some bond" between a parent and a child "does not necessarily defeat termination of her parental rights." *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). Rather, the question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *Id.* The *K.Z.S.* Court affirmed the termination of the mother's parental rights where the child had a stronger bond with foster mother than child had with mother, and child saw foster mother as his primary caregiver. *Id.* at 755, 764.

Instantly, the orphans' court explained:

Dr. Feger testified that there is a bond between Mother and the Child, and that the Child identifies Mother as his "mommy." However, Dr. Feger's evaluation and subsequent testimony at the hearing explained that the Child does not view her as "mommy" in the traditional sense because his relationship with Mother is not one that relates to a primary caretaker. [The] Child spends only a couple hours per week with Mother, and their time together is always supervised. Mother cares for the Child "moderately superficially" in the visitation setting but there are a secondary set

- 21 -

of caregivers — the foster parents — who have served a far greater role for the Child.  Essentially, the relationship between Mother and [the] Child equates to that of an occasional child-care provider or babysitter.

Additionally, the existence of some bond with Mother does not necessarily defeat termination of her parental rights. . . . The Child is currently in a loving and stable home, with two of his biological siblings.  When the Child was removed from Mother's care at approximately 15 months of age, he was behind on his gross motor skills, had extremely high lead content in his blood, had chronic ear infections, and was extremely underweight.  Within two months of being placed in this foster home, the Child began walking and had gained sufficient weight that he no longer needed to have weight checks.  The Child's foster mother testified that they did nothing out of the ordinary — they simply made and attended the Child's medical appointments and monitored his diet to avoid lactose.  This type of consistency and follow-through that has allowed the Child to thrive while in their care is exactly what Mother lacks the ability to achieve.

Mother has been offered numerous services by the Agency since her initial involvement in 2015.  These services were designed to assist Mother with obtaining stable housing and maintaining home conditions, basic parenting, budgeting, connecting with community resources, and follow-through.  The Child has been in this placement for approximately 23 months, and is in a loving and stable home where all his needs are met.  Dr. Feger testified that from a clinical standpoint it would be at least 1-2 additional years before Mother could achieve reunification, and the environment in which he would be placed if reunification efforts are successful does not parallel his current environment.

The foster parents have provided everything the Child needs and this has naturally established a bond and attachment between the Child and the individuals whom he identifies as his primary caretakers.  There are significant concerns about Mother's ability to address her own needs and simultaneously establish a protective capacity to ensure a safe and secure environment for the Child.  Mother's history may be the most accurate prediction of her future and the Child's permanency cannot and should not be delayed until Mother gains the skills necessary to independently and consistently provide appropriate care for the Child.  The Child is clearly bonded with the [foster] parents, who have provided for his physical and emotional needs for

approximately half of his life, and who are willing to offer him permanency. Although there is a bond between Mother and [the] Child that would require some explanation as to the absence of his "mommy," the Court is satisfied that termination of Mother's parental rights would not cause irreparable harm to the Child. This Court further finds that permanency in the form of adoption by those who have met his needs since July 31, 2019, is in the best interest of the Child.

Orphans' Ct. Op. & Decree at 18-20.

Our review of the record indicates that Dr. Feger acknowledged that Mother loves and cares about the Child and she wants to be successful in reunification with the Child. *See* N.T. 6/28/21, at 27. However, Dr. Feger opined that while a bond existed between Mother and the Child, it is not as strong as the Child's bond with the foster parents, and that severing the bond between Mother and the Child would be in the Child's best interests. *See id.* at 16-19.

Based on this record, we discern no abuse of discretion in the orphans' court's findings of fact or conclusions of law that the Agency established the grounds for termination under Section 2511(b) by clear and convincing evidence. *See M.T.*, 101 A.3d at 1179; *C.L.G.*, 956 A.2d at 1010. The record evidence supports the orphans' court's finding that although there was a bond between Mother and the Child, the Child does not identify Mother as his primary caretaker, and the Child would suffer more from the severing of the bond between him and foster parents than from severing the bond between Mother and the Child. *See K.Z.S.*, 946 A.2d at 755, 764. Further, we conclude that the orphans' court appropriately considered the developmental,

physical, and emotional needs and the welfare of the Child and determined that they were best served by the termination of Mother's parental rights. *See C.L.G.*, 956 A.2d at 1010. Accordingly, we conclude that the orphans' court did not abuse its discretion, and we affirm the decree involuntarily terminating Mother's parental rights. *See S.P.*, 47 A.3d at 826.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2022