J-S29033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.W.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 243 WDA 2022 |

Appeal from the Order Entered January 26, 2022
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000004-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.W.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 244 WDA 2022 |

Appeal from the Order Entered January 26, 2022
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000002-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: F.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.W.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 245 WDA 2022 |

Appeal from the Order Entered January 26, 2022
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000003-2021

J-S29033-22

BEFORE: PANELLA, P.J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:          **FILED: OCTOBER 31, 2022**

N.W.C. ("Father") appeals from the orders changing the permanency goals of his children, K.C., M.C., and F.C. (collectively, "Children"), to adoption.[1] Additionally, Father's counsel has filed a petition for leave to withdraw and an accompanying brief pursuant to **Anders v. California**, 386 U.S. 738 (1967).

The record reveals that Jefferson County Children and Youth Services ("CYS") filed an application for emergency protective custody of Children on January 5, 2021. In the application, CYS alleged that it had received reports that Father had physically abused M.C. (born 2013) by striking her with a belt and that S.C. ("Mother") had also participated in the abuse. CYS requested emergency custody of M.C., as well as her younger brother F.C. (born 2014) and sister K.C. (born 2020) based upon the reported physical abuse as well as lack of proper parental care and control. Emergency custody was granted, and a shelter care order was entered on January 8, 2021 after a hearing. Children were placed in foster care together, and, on January 27, 2021, the trial court entered orders adjudicating Children dependent.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father filed a separate notice of appeal at each trial court docket, as required by Pa.R.A.P. 341. Father's appeals were consolidated *sua sponte* by this Court on March 18, 2022. Children's mother, S.C., did not appeal from the goal change orders.

- 2 -

Permanency review hearings were held on May 26 and September 22, 2021 and January, 26 2022. On the date of the last hearing, the trial court entered orders changing the permanency goals of Children from "return home" to adoption. Father filed timely appeals and Pa.R.A.P. 1925(b) statements, and on May 9, 2022, the trial court issued a Pa.R.A.P. 1925(a) opinion.

Before reaching the merits of this appeal, we must first address whether counsel's petition to withdraw and accompanying brief comply with the procedure outlined in **Anders** and related case law. **See In re J.D.H.**, 171 A.3d 903, 906 (Pa. Super. 2017) (holding that **Anders** procedure for withdrawal of court-appointed counsel applies in appeals from goal change orders, even in the absence of an involuntary termination decree). In order to withdraw under **Anders**, counsel must

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the **Anders** brief to the appellant; and 3) advise the appellant that he or she has the right to retain private counsel or raise additional arguments that the appellant deems worthy of the court's attention.

**Id.** at 907 (quoting **Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*); brackets omitted).

With respect to the third requirement, counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." **Id.** (quoting **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005)). Because a parent has a continuing right to

counsel in dependency proceedings, an attorney seeking to withdraw in an appeal from a goal change order is required to

> inform the parent of his or her right to counsel in any subsequent dependency or involuntary termination proceedings. Counsel must also inform the parent that, if he or she cannot afford counsel, he or she may contact the trial court in order to obtain new counsel. This information must be conveyed to the parent at the same time that counsel informs the parent of his or her other rights pursuant to *Anders*[.]

*Id.* at 906-07.

> Furthermore, the *Anders* brief must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 907 (quoting *Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009)).

In his petition to withdraw, counsel indicated that he had thoroughly reviewed the record and determined that there are no non-frivolous grounds for this appeal. Counsel sent a letter to Father advising him of his right to retain new counsel or proceed *pro se* and raise any additional issues he

- 4 -

deemed worthy of this Court's attention.[2]  Counsel's letter also advised Father of his right to appointed counsel in any subsequent dependency or termination proceeding and that he should contact the court to obtain new counsel if he could not afford it.  ***See id.*** at 906-07.  This letter was attached to counsel's petition for withdraw, and it indicates that counsel provided Father with the petition to withdraw and ***Anders*** brief; counsel's certificates of services likewise demonstrate that the relevant filings were served on Father.  Furthermore, counsel's ***Anders*** brief includes a summary of the relevant procedural and factual history of this case and discusses the reasons upon which counsel bases his conclusion that the appeal is frivolous, with citations to the record and applicable case law.

We thus conclude that counsel has complied with the procedural requirements for withdrawal, and we proceed to review the merits of this appeal.  We first consider the issue raised by counsel in his ***Anders*** brief and determine whether it is in fact frivolous.  ***Id.*** at 908.  In addition, if we determine that the issue raised by counsel is frivolous, we then proceed to "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel."  ***Id.*** (quoting ***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015)).

---

[2] As of the date of this decision, Father has not filed a *pro se* brief with this Court, nor has privately retained counsel entered an appearance on Father's behalf.

- 5 -

Counsel raises the following issue in his brief: "Whether the lower court erred in changing the permanency placement goal to adoption?" ***Anders*** Brief at 4. Our review of an order changing the goal of the dependency proceeding from reunification to adoption is under an abuse of discretion standard. ***In the Interest of H.J.***, 206 A.3d 22, 25 (Pa. Super. 2019); ***J.D.H.***, 171 A.3d at 908. "In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record." ***H.J.***, 206 A.3d at 25 (citation omitted). We must accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but we are not required to accept the lower court's inferences from those facts or conclusions of law. ***J.D.H.***, 171 A.3d at 908. Where the trial court's findings are supported by competent evidence, this Court will affirm "even if the record could also support an opposite result." ***H.J.***, 206 A.3d at 25 (citation omitted).

> Pursuant to Section 6351(f) of the Juvenile Act, 42 Pa.C.S. § 6351(f),
>
> when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; [and] (6) the child's safety[.]

***J.D.H.***, 171 A.3d at 908 (citation omitted).

While not explicitly addressed in Section 6351, the trial court should also "consider the bond between the child and his parents, foster parents, and siblings." **In re M.T.**, 101 A.3d 1163, 1175 (Pa. Super. 2014) (*en banc*). "[W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors." **Id.** (citation omitted). However, "[i]t is well settled that the focus of all dependency proceedings, including goal change proceedings, is on the safety, permanency, and well-being of the child and the best interests of the child must take precedence over all other considerations." **H.J.**, 206 A.3d at 25. Thus, "[i]n considering a goal change motion, the trial court has a responsibility to look to the best interests of [the c]hild and not those of [the c]hild's parents." **In the Interest of T.M.W.**, 232 A.3d 937, 945 (Pa. Super. 2020).

Where reunification with the parent is not in the child's best interests, the trial court may determine that adoption is the appropriate permanency goal. 42 Pa.C.S. § 6351(f.1)(2); **H.J.**, 206 A.3d at 25. "When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." **H.J.**, 206 A.3d at 25 (citation omitted). "[A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **J.D.H.**, 171 A.3d at 908 (citation omitted).

In this matter, Children initially came to the attention of CYS in October 2020 following reports of Children's poor hygiene, as well as reports of physical abuse resulting in bruising and marks, including F.C. being hit by a belt. N.T., 1/8/22, at 6-7. Father and Mother ("Parents") were advised by CYS not to use the belt for discipline of Children, but CYS received another report in early January 2021 that M.C. had numerous bruises on her back and leg. *Id.* at 7. M.C. reported to CYS that she had been struck by the belt numerous times, and Father admitted to hitting her after she lied about taking a piece of chocolate. *Id.* at 7-8.

Children were removed from Parents' care and placed in foster care together. At the January 27, 2021 hearing, Children were adjudicated as dependent based upon the stipulation of Parents. N.T., 1/27/22, at 4-5. CYS requested at the hearing that Parents complete a psychological evaluation and take anger management classes. *Id.* at 6.

At the first review hearing, in May 2021, Rebecca Sallack, the CYS caseworker, reported that Parents had been recommended to participate in therapy following their psychological evaluation, but they had not followed up promptly to schedule with a therapist and therefore they had not begun therapy as of the date of the hearing. N.T., 5/26/21, at 12-14, 17. Father had completed anger management and parenting courses; however, there was concern as to whether Parents would be able to implement what they had learned during the courses as they continued to justify their physical discipline of Children. *Id.* at 17-20. Concerns were noted during supervised visits with

Children, which were then suspended; these concerns included Father's difficulty in connecting with Children and his discipline of both of the older Children when only one had misbehaved. *Id.* at 20-24, 34-35. The older Children's behavior markedly improved following the suspension of the supervised visits, with M.C. ceasing engaging in certain violent behavior and bullying of F.C. and F.C. becoming more assertive and social. *Id.* at 54-63. In addition, F.C. ceased urinating himself at school after being placed in foster care, but the habit returned in the days just prior to and after the supervised visits. *Id.* at 8, 25, 47-48.

Father made some progress by the time of the second review hearing in September 2022, with Father accepting criminal responsibility for the abuse of M.C. and his recognition that he was at least partly responsible for the physical discipline that led to removal. N.T., 9/22/21, at 15, 24. Father also attended the majority of his anger management classes and he had acknowledged that he had anger problems in the marital relationship. *Id.* at 8-13, 24, 26. However, there were significant issues in Parents' home, including overpowering urine and body odors that had been reported at the last hearing and marital discord resulting from Mother's affair with a man she had invited to live in the home and Father's subsequent physical fights with him. *Id.* at 11-16, 18-19, 26; N.T., 5/26/21, at 22-23. There was also concerning behavior when Parents visited M.C. in the hospital after she had emergency appendix surgery and engaged in "play pinching," including on her abdomen. N.T., 9/22/21, at 17, 25. In addition, Parents repeatedly tickled

F.C. when they saw him on the morning of the hearing, despite the fact that he was sick with a cold. *Id.* at 36.

The CYS caseworker reported at the September hearing that Children had moved to a new foster home since the last hearing and that the negative behaviors of M.C. and F.C. had significantly decreased since the move. *Id.* at 39-41. The foster parents were fully caring for Children's needs and indicated that they are interested in a long-term placement. *Id.* at 41, 44-45. Further, M.C. and F.C. informed the caseworker that, while they wanted to visit with Parents, they preferred to stay with the new foster family rather than be returned to Parents. *Id.* at 44.

At the final hearing on January 26, 2022, the situation was "progressively getting worse and worse and worse." N.T., 1/26/22, at 26. While Father had completed his parenting and two rounds of anger management classes and was continuing to visit his mental health therapist with some absences, *id.* at 10-12, 31, the CYS caseworker summarized the multiple concerns that had been detected during the in-person visits:

> [CYS] has concern[s] with parents' inability to interact appropriately with their children, constant tickling, inappropriate touches, smacking, mixed directions to the children during visits, winding them up and then telling them to calm down, concerns of them making the kids get up and do things for them, . . . parents ignoring [F.C.], putting kids in timeout and not explaining to them why they're in timeout, forgetting they're in timeout. The kids have to ask, Mommy, Daddy, Mommy, Daddy, Mommy, Daddy.
>
> Inability to work through [F.C.'s] homework. [F.C.] is really hard to get to settle to do homework. The parents get quickly irritated with [F.C.] for not eating or doing his homework. Concerns with

> the parents ignoring suggestions by [the family advocate and counselor] who supervise[] the visits . . .
>
> [F.C.'s] twitching and his flinching have increased since visits started back up. Concerns for [F.C.] urinating his pants during visits, concerns for the parents' inability to connect with their children, talk with them about things that they like to do.
>
> The parents have had 11 visits, have not been able to apply what they have learned through parenting [classes] during these visits and failed to utilize the recommendations from [the professional staff] who supervise[] the visits.

*Id.* at 10-11.

The visits were halted in early January 2022 due to Parents' lack of cooperation, poor communication, and not following through on parenting recommendations. *Id.* at 8, 12-17, 26-28. Parents were not amenable to scheduling home visits with the caseworker, and therefore CYS was also not able to inspect their home after October 2021. *Id.* at 13, 29. CYS was thus not able to ensure that Children would have a safe environment in Parents' home when prior visits had revealed that there were two different men periodically staying at the home, one who had engaged in inappropriate discipline of Children and the second who was Mother's paramour and had been involved in physical altercations with Father. *Id.* at 15, 31.

The CYS caseworker testified that the agency's recommendation was that the goal be changed to adoption. *Id.* at 18. She explained that the foster parents were providing for all of Children's needs, including special needs related to F.C.'s behavioral issues and M.C.'s medical crisis, and that foster parents keep Children in well-structured routines and do not have difficulty in making Children do their homework. *Id.* at 35-36, 39-40. Children refer to

- 11 -

foster parents as "mommy" and "daddy" and they were not upset that the visits with their Parents were suspended, nor did they request that the visits resume. *Id.* at 37, 39-40. The caseworker specifically noted that M.C. was relieved to find out that she was going to stay at the foster home through Christmas and that F.C.'s urination problems had again begun to subside after the visits ceased. *Id.* at 36, 38.

Amanda Summy, a family advocate at the Bair Foundation, testified at length regarding her observations of Parents' problematic behavior during the 11 visits she supervised. *Id.* at 42-55. While Summy acknowledged that the first two visits went well, she described various instances of inappropriate play in the remaining visits, including Father's frequent and prolonged tickling and play wrestling with M.C., as well as one instance when he bit her finger and hit her on the hand. *Id.* at 45-54. Father also squeezed M.C. and F.C. around the head and body on several occasions; the tickling, rough play, and playful smacks often ended up with Children crying or in pain. *Id.* at 50-54. Father also at times had difficulty in containing his anger during the visits, such as instances in which he raised his voice, told F.C. to stop his involuntary twitching, and physically moved F.C.'s head in an attempt to get him to focus on his homework. *Id.* at 51-53, 61-62. Summy also explained that Parents were argumentative with the counselor who was monitoring the visits remotely, completely disregarded her advice, and they showed no improvement in being able to read or respond to Children's emotional needs. *Id.* at 48, 55, 64.

Annette Tucker, the licensed professional counselor who worked with Parents on their supervised visits, also described a progressive worsening of Parents' performance during the visits. *Id.* at 69. Tucker described concerns relating to Father's aggressive play to the point that M.C. jumped back in fear once when Father simply walked by her, Parents' apparent lack of any emotional attachment to Children, and their inability to control Children's chaotic behavior. *Id.* at 70-72. Tucker also stated that Parents were inattentive to Children, often ignoring their requests for attention and forgetting that one of the Children was in a timeout for periods of up to 20 minutes. *Id.* at 72-73, 75. Tucker summarized her opinion of Parents' style of discipline as "abuse." *Id.* at 77. She also explained that Father's "nonstop" tickling of M.C., particularly on her inner thigh, was "a red flag for sexual abuse." *Id.* at 74-76, 88.

By contrast, Tucker stated that her observations of Children's interactions with their foster parents were positive. *Id.* at 78-79. Children call the foster parents "mom" and "dad," and the foster parents listened to Children and comforted them as needed after the visits. *Id.* When asked for her recommendation, Tucker stated that she believed that the visits with Parents should end because the Children's "ticks are back" and they are exhibiting "trauma responses." *Id.* at 80; *see also id.* at 101-02. Tucker said that, in light of the lack of Parents' progress, they could not provide the stable environment Children need to become successful adults. *Id.* at 80.

The final witness at the January 26, 2022 hearing was Allen Ryan, Ph.D., who was admitted as a child psychology expert and who had reviewed various records associated with the case. Dr. Ryan opined that Parents expressed no interest in positive parenting changes to the point that it appeared to be a waste of agency resources to continue to engage with them. *Id.* at 110. Dr. Ryan noted that Parents appeared to lack a strong and secure bond with Children and Children were fearful of Parents. *Id.* at 111-12. Dr. Ryan indicated that reunification could lead to further abuse and that psychiatric evaluation of Parents, with potential medication and additional months of therapy, was necessary before reunification could even be considered. *Id.* at 113-15, 121.

The trial court explained its rationale for ordering the change of the permanency goal to adoption in its Pa.R.A.P. 1925(a) opinion:

> In this case, the children had been in foster care for just over a year when the [c]ourt changed the goal from reunification to adoption. For a substantial amount of that time, they had no contact with Father, who was a significant source of their trauma. During that period, Father worked toward checking off his permanency plan requirements, including the completion of a second round of anger management as ordered by this Court. Once visitation commenced, however, he demonstrated a near-complete inability to implement the skills he was supposed to have learned by then. More than simply unable, he was also unwilling to take advice from the expert attending visits by Zoom (and once in person) with the specific goal of helping him to appropriately connect and interact with his children. What followed was that Father's parenting skills by the eleventh visit were worse than they had been during the first visit. It was not he who suffered because of it, though; it was his children, whose anxiety and trauma responses increased over time, causing them to regress after experiencing months of continuous improvement while outside of

their parents' influence. The [c]ourt had no expectation that staying the course would do anything but expose the children to additional trauma, either. Father's lack of awareness or willingness to change gave it no reason to imagine that things would be different any time soon.

The goal change no doubt seems unfair to a parent who can honestly say, "But I was checking off permanency plan boxes." As Father has evidenced, however, one does not absorb good parenting skills by attending classes or counselling; he can do either or both *ad nauseum*, pass any number of written exams, and still be unable to be an effective parent. In such instances, the law does not require courts to leave the affected children languishing in foster care with the hope that more time and more classes will eventually rectify their parents' deficiencies. On the contrary, it prioritizes the children's need for permanency.

In these cases, the children's best chance was effectuated by a goal change. Currently they are living with a nurturing foster family in whose care they have been thriving—a family that, by all indications, will in fact provide permanency. Father's history, on the other hand, indicates that he will not be a viable permanency option any time in the near future.

Trial Court Opinion, 5/9/22, at 1-2.

Upon review, we agree with counsel that any challenge to the trial court's exercise of discretion in ordering the change of permanency goals to adoption would be wholly frivolous. The record is replete with evidence that Parents had made little progress towards remedying the issues that led to removal more than 12 months before the goal change orders. While they completed parenting and anger management classes, Parents were unable to apply the lessons they learned during the classes when interacting with Children and rejected nearly all of the recommendations given to them by the counselor who supervised the visits. In fact, the witnesses were unanimous that Parents' parenting skills worsened over the course of the supervised

visits, rather than showing improvement. Father, in particular, exhibited numerous concerning behaviors—including rough play to the point that he caused Children distress and pain, ignoring Children, and an inability to effectively discipline Children or direct them towards productive activities— and he resisted various requests to alter his parenting style. Parents also failed to make their home available for inspection by CYS to ensure that it would provide a safe environment for Children, which was a concern as a result of the home's unsanitary condition and reports of several individuals who were staying in the home who presented a potential threat to Children's safety.

Additionally, the record amply supports the trial court's conclusion that Children are well-cared for in their current foster home. Foster parents are providing for Children's health, educational, and emotional needs and have been able to provide the stability and supporting family environment that is lacking in their relationship with Parents. The salutary effect of life in the foster home is most evident when taking into account the testimony that Children's behavioral and anxiety issues abated the more time spent in the foster home and apart from Parents. Foster parents have also indicated that they hope to provide a long-term placement that will allow Children to thrive as they grow towards adulthood.

As counsel notes, the trial court's goal change orders address each of the relevant factors under Section 6351(f) of the Juvenile Act, including the continuing necessity and appropriateness of the placement, Children's safety

in their current foster home, and Parents' progress towards alleviating the conditions which necessitated the placement. *See* Orders, 1/26/22; 42 Pa.C.S. § 6351(f)(1), (3), (6).[3] The testimony developed at the three permanency hearings demonstrates that Father did make some progress towards achieving the goals of the permanency plan, but he failed to put any of the parenting lessons he had been instructed on into practice.[4] Furthermore, CYS has clearly made "reasonable efforts" to return Children to Parents, but those efforts have failed and the agency has properly redirected its efforts towards placing Children in an adoptive home. *H.J.*, 206 A.3d at 25 (citation omitted).

Based on the foregoing, we agree with counsel that the issue raised in his *Anders* brief is wholly frivolous and that the trial court acted within its

---

[3] Although Section 6351(f)(9) provides that the trial court give extra consideration to the well-being of any child that has been in placement for at least 15 of the last 22 months, this Court has explained that "the fifteen-to-twenty-two-month timeframe set forth in the Juvenile Act is not prerequisite to a goal change, but rather is an aspirational target in which to attain permanency." *J.D.H.*, 171 A.3d at 909 (citation and quotation marks omitted). Therefore, this section is not a guarantee to parents that they will have at least 15 months within which to achieve an acceptable level of parental capacity, *id.*, and the trial court here did not err by changing Children's permanency goal to adoption after approximately 12½ months. *See id.* (concluding that trial court acted in accordance with Juvenile Act when changing permanency goal to adoption even though only seven months had lapsed since removal).

[4] This Court has affirmed trial court decisions changing the permanency goal to adoption in cases where the parent had made substantial progress towards completion of the permanency plan but failed to apply parenting lessons and still exhibited problematic parenting skills. *See, e.g., M.T.*, 101 A.3d at 1175-76; *In re N.C.*, 909 A.2d 818, 825-26 (Pa. Super. 2006).

discretion and in accordance with the Children's best interests in changing their permanency goals to adoption. In addition, we have reviewed the certified record and have discovered no additional non-frivolous issues. Therefore, we grant counsel's petition to withdraw and affirm the January 26, 2022 orders.

Orders affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2022